DECISION AND JUDGMENT ENTRY
This is an appeal from a February 1, 2000 judgment entry of the Erie County Court of Common Pleas in which the court denied a motion for a new trial, thereby allowing a previous judgment filed on December 2, 1999 to stand. In the December 2, 1999 judgment entry, the trial court adopted the findings of fact and conclusions of law submitted by appellee, Kathie S. Carter, and ordered appellant, United Pentecostal Church, to pay $21,590 with interest at the statutory rate from October 30, 1995. Appellant has presented six assignments of error that are:
"ASSIGNMENT OF ERROR I
 THE TRIAL COURT ERRED IN DECLARING THAT THE LETTER PREPARED BY APPELLEE CARTER WAS A MODIFICATION OF THE CONTRACT.
"ASSIGNMENT OF ERROR II
 EVEN IF THE OCTOBER 26, 1995 LETTER WAS AN AMENDMENT TO THE AGREEMENT FOR ARCHITECTURAL SERVICES BETWEEN PARTIES, THE CONTRACT WAS EXECUTORY AND THE TRIAL COURT ERRED IN GRANTING JUDGMENT TO APPELLEE (CARTER) WHEN APPELLEE (CARTER) HAD FAILED TO COMPLETE THE TERMS AND CONDITIONS OF THE CONTRACT
"ASSIGNMENTS [SIC] OF ERROR III
 THE TRIAL COURT ERRED IN ADOPTING THE FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBMITTED BY APPELLEE(CARTER), BECAUSE THEY FAIL TO GIVE FULL CREDIT TO APPELLANT (CHURCH) FOR PAYMENTS TO APPELLEE(CARTER)
"ASSIGNMENTS [SIC] OF ERROR IV
 THE TRIAL COURT ERRED AS A MATTER OF LAW IN AWARDING INTEREST AT THE STATUTORY RATE FROM OCTOBER 30, 1995.
"ASSIGNMENT OF ERROR V
 THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO REQUIRE THE APPELLEE (CARTER) TO MITIGATE HER ALLEGED DAMAGES
"ASSIGNMENT OF ERROR VI
 DUE TO APPELLEE'S (CARTER) FAILURE TO FULFILL THE TERMS OF THE AGREEMENT, THE APPELLANT (CHURCH) IS ENTITLED TO A REFUND OF $22,300"
This case began when appellee, an architect, filed a complaint in the Erie County Court of Common Pleas on March 21, 1997 against appellant, a church congregation located in Indiana. In her complaint, appellee alleged that appellant had breached a contract it entered into with her for her services, and that it owed her $18,590. Attached to her complaint was: 1) the copy of a written contract signed by the parties on July 24, 1994; 2) a letter dated October 26, 1995 that appellee sent to appellant that was signed by the assistant pastor of appellant and faxed back to appellee; and copies of invoices prepared by appellee that were sent to appellant.
Appellant initially sought a dismissal of the complaint, arguing that the trial court lacked jurisdiction because appellant is a not-for-profit corporation in Indiana. However, after the court denied the motion to dismiss, appellant filed an answer denying any liability and a counterclaim, seeking a refund of an alleged overpayment to appellee. Appellee filed an answer to the counterclaim, and the case proceeded to trial.
At the conclusion of testimony from witnesses called by appellee and appellant, trial counsel agreed to forgo closing arguments. The visiting judge who heard the case directed both parties to submit proposed findings of fact and conclusions of law within fourteen days. On December 2, 1999, the trial court filed a judgment entry in which it said:
 "The Court adopts the findings of fact and conclusions of law submitted for and on behalf of the Plaintiff:
 "It is, therefore ordered that judgment is rendered in favor of the Plaintiff and against the Defendant in the sum of Twenty- One Thousand Five Hundred Ninety Dollars ($21,590.00) with interest at the statutory rate from October 30, 1995.
"Costs assessed to the Defendant."
While neither the findings of fact nor the trial court's judgment entry contained specific language finding that the counterclaim was not well-taken, the trial court's order granting appellee's claim for even more money than appellant had already paid her showed by implication that the counterclaim for a refund of some of the money paid was denied.
On December 15, 1999, appellant filed a motion for a new trial pursuant to Civ.R. 59. Appellant argued that the judgment in the amount of $21,590 was not sustained by the weight of the evidence and that the judgment was contrary to law. On February 1, 2000, the trial court denied the motion for a new trial. Appellant then filed this appeal.
In support of its first assignment of error, appellant argues that the trial court erred when it ruled that a letter sent to appellant by appellee constituted a modification of the original contract between the parties. First, appellant says that its assistant pastor did not have the authority to bind it to a contractual modification, so his signature on the copy faxed in return to appellee is meaningless. Second, appellant argues that the October 26, 1995 letter created ambiguities regarding:
 1) the total fee owed to appellee if the contract was completed; and 2) payment terms of the fee. Appellant says that since appellee drafted both the original contract dated July 24, 1994 and the letter dated October 26, 1995, any ambiguity in those documents must be construed against her. Appellant says that due to these ambiguities there was no agreement between the parties regarding the amount of money owed to appellee.
The Supreme Court of Ohio has said:
 "`Apparent authority' has been defined as '* * * the power to affect the legal relations of another person by transactions with third persons * * * arising from * * * the other's manifestations to such third persons.' 1 Restatement of the Law 2d, Agency (1958) 30, Section 8. This court, in Miller v. Wick Blg. Co.
(1950), 154 Ohio St. 93, 42 O.O. 169, 93 N.E.2d 467, paragraph two of the syllabus, held that:
 "`Even where one assuming to act as agent for a party in the making of a contract has no actual authority to so act, such party will be bound by the contract if such party has by his words or conduct, reasonably interpreted, caused the other party to the contract to believe that the one assuming to act as agent had the necessary authority to make the contract.' See, also, Cascioli v. Central Mut. Ins. Co. (1983), 4 Ohio St.3d 179, 181, 4 OBR 457, 459, 448 N.E.2d 126, 128.
 "Further, this court in General Cartage Storage Co. v. Cox (1906), 74 Ohio St. 284, 294, 78 N.E. 371, 372, explained that, `where a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages, and the nature of the particular business, is justified in assuming that such agent is authorized to perform on behalf of his principal a particular act, such particular act having been performed the principal is estopped as against such innocent third person from denying the agent's authority to perform it.' * * *'
 "Thus, in order for a principal to be bound by the acts of his agent under the theory of apparent agency, evidence must affirmatively show: `* * * (1) that the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority. The apparent power of an agent is to be determined by the act of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of the authority and not where the agent's own conduct has created the apparent authority. * * *' Logsdon v. ABCO Constr. Co. (1956), 103 Ohio App. 233, 241- 242, 3 O.O.2d 289, 293, 141 N.E.2d 216, 223; Ammerman v. Avis Rent A Car System, Inc. (1982), 7 Ohio App.3d 338, 7 OBR 436, 455 N.E.2d 1041; Blackwell v. Internatl. Union, U.A.W. (1983), 9 Ohio App.3d 179, 9 OBR 289, 458 N.E.2d 1272." Master Consolidated Corp. v. Bancohio Nat'l. Bank (1991), 61 Ohio St.3d 570, 576-577.
Applying these standards to the facts of this case, we find that the testimony and other evidence presented at trial support the finding of the trial court that the assistant pastor had apparent authority to bind appellant to a contract modification.
While the senior pastor testified that the assistant pastor did not have the authority to make any commitment that would bind appellant,i.e. that the assistant pastor did not have any actual authority to sign a contract modification, the testimony of the senior pastor, the assistant pastor, and appellee supported the trial court's conclusion of law that the assistant pastor had apparent authority. The senior pastor testified that he was often away from the church because of several other commitments he had, such as holding three day conferences. He said he leaned heavily on the assistant pastor to keep the building project underway. He acknowledged that the assistant pastor and appellee had several meetings when he was not present to discuss the changes to be made in the building.
The assistant pastor and appellee testified that in addition to in person meetings, they conferred over the phone frequently about changes to make in the architectural plans for the building. The senior pastor acknowledged that he never told appellee that the assistant pastor was not authorized to act as an agent of appellant for contract purposes. His testimony also showed that appellant continued to make payments to appellee for invoices she sent after the assistant pastor signed the letter. In fact, he testified that appellant had actually paid more than the original contract amount of $29,900 before he finally asked his secretary to check their records of the amounts already paid to appellee when the assistant pastor came to him with another invoice, which appellant ultimately refused to pay, and which led to this case being filed. This testimony, taken as a whole, shows that appellee could reasonably believe, based upon the actions of appellant and its authorized agent, the senior pastor, that the assistant pastor had authority to sign the modification to the original contract.
We now turn to appellant's second argument in support of his first assignment of error. Appellant argues that the October 26, 1995 letter created ambiguity regarding the total amount appellant now owed appellee for the completion of the building project and regarding the payment terms of the fee.
The original contract drafted by appellee and signed by the parties on July 24, 1994 stated, in pertinent part:
 "The new facility will require much code review to meet the needs of the mixed uses and construction types. Approximately 38,000 square feet of finished floor area and another 8,000 square feet of unfinished floor area are planned.
 "A preliminary design has been proposed and accepted. Planning has included a space large enough for future growth, while preventing the need to build again in a year or two.
 "Design development will polish this floor plan into one which is acceptable for code and life safety, as well as economy in construction."
"* * *
"C. ARCHITECTURAL FEE:
 "The flat fee for architectural services is $29,900. This fee includes architectural design, engineering for electrical, plumbing, mechanical, and a typical structural design. The final structural design will be provided by a structural steel company.
 "Interior design, cad drawings, renderings, models, or construction administration services are available only as an additional service and would require an additional negotiated contract.
 "The fee does not include printing costs, nor plan review costs or permit / application fee.
"The fee will be paid in the following manner:
a. Completion of preliminary design phase: $8,800.
b. Completion of design development phase: $7,000.
 c. Balance of the fee, $14,100 due prior to release of final documents.
 "This fee is very competitive, and I would need to reserve the right, that if unexpected major revisions (which are not the fault of the architect) occur after design development, that these additional cost be paid as additional services.
 "Your signature below indicates your agreement with the stated summary and terms. Architectural work will continue on this project only after receipt of signed agreement and a check for the preliminary design work completed to date, $8,800. Work will procede [sic] after each phase only after payment and signed approval by the Church Representative."
Appellant says that these clear contractual provisions were rendered ambiguous by the language used in the following letter that the trial court ruled is a modification of the contract:
""October 28, 1995
"Attention: Irvin Baxter, Jr., Pastor
United Pentecostal Church
* * *
"Dear Pastor Baxter:
 "I said a prayer for you and your hopeful sale of your existing building. Hopefully this is just the catalyst to begin to move your project into reality. I have talked with the Engineers, and will try to provide you this information as simply as I can. I wrote it once, and even I can not understand it and had to start over.
"A. Structural Design Engineer
 "To try to design a building that better stays within budget for the basic structure, it will greatly be to your advantage to use the full services of a structural engineer. Ray has met Ben Grow, and we have gained confidence that Ben will greatly reduce the steel cost from the bid which you received this summer. Ben's cost was given to me in 2 options:
 "1. Design of foundations, balcony framing, 2nd floor framing only, with the roof design by a premanufactured steel building company, using concrete block bearing walls, the design fee is $11,200.
 2. Design of foundations, balcony framing, 2nd floor framing, roof framing, using concrete block bearing walls; all framing to be open web joists. Project to be bid to joist companies with option of premanufactured steel building companies submitting an alternate, the design fee is $14,400.
 "In either case, caissons are an additional cost should they be required.
 "The first option, while it is a savings, still allows too much power to the steel company. I trust you will agree that the option number two, the full design, will put you in a far better bargaining position.
 "B. Electrical and Lighting, Mechanical, Plumbing Design Engineer
 A building of this size and complexity requires a Professional Engineer of the same caliber as Ben, someone who will provide far more information and more accurately than someone designing a simpler building somewhat larger than a house. This engineer has provided a very competitive price, an excellent price. His fee is in two parts; $8,000 for plumbing and mechanical, $3,000 for electrical and lighting — a very budget conscious design, for a total fee of $11,000.
 "Every year I learn more, become a little wiser. I feel strongly about this need for professional engineers to provide you with cost effective systems that will work. Ray has also met this engineer, Gerrit Van Straten, and we agree that he is more than qualified. I believe that you will be happier, and will find the design fees will provide you with a good program and excellent service.
"C. Specialty lighting, Audio Visual, Sound
 It is the Church's responsibility to provide the selected engineer with the requirements for these systems. Ray will recommend consultants to provide these specifications, who will coordinate with Gerrit Van Stratton.
"D. Site Engineering
 It is the Church's responsibility to provide the site engineering. The building engineering must provide the grading design as it meets the final building location.
 "A Soil Test Report is required before the Structural Engineer can provide a Foundation Design. If Ben designs with concrete bearing walls and the soil will not support them and then require caissons, Ben will charge you for work done more than once.
"D.[sic] Summary
 These licensed Professional Engineers, fully experienced in designing buildings of this size and complexity, have agreed to provide these services for a very competitive total price of $25,400. I have not marked up their prices in any way. Truthfully, I expected that the structural design alone would cost this much. I am just so pleased to have found Ben and Gerrit to work with, and I know you will agree when you meet them.
"E. Limitations
 These fees are based upon the work load schedules of the engineers at this time. Should this project be delayed by owner for more than 60 days, it is reasonable that the fees be re-evaluated. These fees are far above and beyond the fee I first quoted you. You understand and agree that these fees are in addition to the balance due.
"F. Time Frame
 Every project provides unexpected challenges. While we know that you would like this design yesterday, it is important to us that you understand that every complication affects the schedule while it offers the opportunity for an even improved building and the people who will use it."
Our own review of the above quoted documents leads us to the conclusion that the language in the letter did not create any ambiguity regarding the total amount owed by appellant for the project. Appellee clearly indicated that: "You understand and agree that these fees are in addition to the balance due." The balance due up until the time of the modification was the amount that remained to by paid on the original contract price of $29,900. Therefore, the letter clearly explained that the total cost of the project had just increased by $25,400. The assistant pastor circled that amount before he signed the letter and faxed it back to appellee. Accordingly, the total amount owed by appellant following the modification was $29,900 plus $25,400, totaling $55,300.
Furthermore, the letter did not indicate any ambiguity regarding the method of payment for services. Appellee clearly indicated that appellant was now responsible to pay $25,400 for needed engineering services, so that she could complete her work. This language is to be construed in conjunction with the language of the original contract. The original contract provided that payment for the first two stages in the design of the building were to be made upon completion of drawings, but that the final payment was to be made before appellant received the final set of construction drawings. Appellee was therefore entitled to full payment before she completed the construction drawings. Accordingly, following the modification of the contract appellant was required to pay the invoice appellee sent for the engineering services before appellee was required to provide appellant with a completed set of construction drawings. Appellant's first assignment of error is not well-taken.
In support of its second assignment of error, appellant argues in the alternative that even if the October 1995 letter is a valid and binding modification of the contract, the trial court erred when it granted judgment to appellee because appellee had not completed her part of the contract. Appellant says the contract was still executory. Appellant argues that the contract conditioned its obligation to make payments on appellee's completion of work. Appellant says that since appellee still has not provided a completed set of construction drawings, appellant has no obligation to continue making payments. Appellant says appellee gave no satisfactory explanation why she had not used any of the $38,100 appellant alleged it had paid to appellee to pay the bills submitted to her by the consulting engineers she hired following the assistant pastor's signature on the October 1995 letter.
Appellant cites to a case decided by the Supreme Court of Ohio in 1833, Morgan v. Ward (1833) Wright 474, for the proposition that when a contract conditions payment on completion of work, no money is owed until the work is done. While we accept that proposition is still valid law in Ohio, as we noted in our discussion of the first assignment of error, the contract and modifying letter in this case, when read together, show that appellant was obligated to make full payment before it received final construction drawings from appellee. Therefore, based upon the terms of the agreement between appellant and appellee, the proposition cited by appellant in support of its argument is not applicable. While appellee should have paid the engineers the amount she received from appellant that exceeded her initial fee of $29,900, the evidence shows that appellant had still not provided appellee with the total amount it owed her, $55,300, that would then require her to finish her obligation under the contract to provide appellant with completed construction drawings and appellant had not given appellee enough extra money to pay the bill of either consulting engineer in full. Appellee testified that until appellant paid the amounts owed to the consulting engineers she could not obtain the information she needed to complete her construction drawings. Accordingly, we find appellant's argument in support of this assignment of error unpersuasive. Appellant's second assignment of error is not well-taken.
In support of its third assignment of error, appellant argues that the trial court erred when it adopted appellee's proposed findings of fact and conclusions of law because appellee did not give full credit to appellant for the amount of money appellant paid to appellee. Specifically, appellant complains that the statement of facts reflected that appellant only paid appellee $33,600, when appellant presented undisputed evidence at trial that showed that it had actually paid appellee $38,100. Appellant says that this mistake is significant, because even if this court agrees with the trial court that the letter was a binding modification, when the correct amount is credited to appellant it reduces the total amount appellant owes appellee from the ordered judgment of $21,590 to $17,200 ($55,300 minus $38,100 equals $17,200).
This court will not reverse a trial court's finding of fact if the finding is supported by competent, credible evidence in the record. C.E.Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. In this case, our own review of the record shows there is merit to appellant's argument and that the finding of fact was against the manifest weight of the evidence. On cross-examination, appellant asked appellee if she had received over $38,000 from appellant. At first she gave the equivocal answer of "Something like that." However, when she was pressed to give a yes or no answer, she answered "Yes." Furthermore, when the senior pastor of appellant testified on direct, he testified that appellant had paid appellee a total of $38,100, and he presented the check registry of appellant showing the payments made to appellee in 1994 and copies of the canceled checks for all the payment made to appellee after 1994, which were admitted as exhibits at trial. As we have previously noted in our discussion of preceding assignments of error, the contract, as modified, obligated appellant to pay a total amount of $55,300. Appellant is correct that it must be given credit for the full amount it has already paid appellee, $38,100, and that the amount it is ordered to pay to appellee must be reduced to $17,200. Appellant's third assignment of error is well-taken.
In support of its fourth assignment of error, appellant argues that the trial court should not have ordered it to pay statutory interest from October 30, 1995. Appellant says that since appellee has not produced construction drawings, it owes her no money. Appellant says that since it does not owe appellee money, no statutory interest can be charged.
Our analysis of the preceding assignments of error shows that appellant does owe appellee money. Therefore, appellant's fourth assignment of error is not well-taken and is denied. See Royal Electric Constr. Corp.v. Ohio State Univ. (1995), 73 Ohio St.3d 110, 113 at the syllabus; H.E.Reichle, Inc. v. Murphy (Aug. 7, 1998), Lucas App. No. L-96-067, unreported.
In support of its fifth assignment of error, appellant argues that the trial court erred when it did not require appellee to mitigate her damages. Appellant says that appellee testified that the engineers were owed between $18,000 or $19,000 "if the project went forward." However, appellant says, appellee testified that if the project did not go forward, the amount appellant would owe would be $9,075.
Appellee responds that she could not mitigate her damages. She already ordered work from the outside engineers and incurred an obligation to pay them between $18,000 or $19,000. The engineers would not release their drawings without being paid, and one had already threatened to file suit against her to collect his fee. She says: "There was no evidence presented at trial by United Pentecostal that Carter could make ordinary or reasonable efforts to mitigate any part of the fees owed to the engineers."
Our review of the transcript in its entirety leads us to conclude that appellee's view is the correct one. Appellee clearly testified that the outside consultants had already been hired, had prepared drawings and were billing her for their work. We fail to see how appellee could be in a position to mitigate her damages at that stage of the project. Accordingly, appellant's fifth assignment of error is not well-taken.
In support of its sixth and final assignment of error, appellant argues the trial court erred when it denied appellant's counterclaim. Appellant says that it is entitled to a refund of $22,300 because appellee has not fulfilled her part of the bargain of the contract. Appellant says appellee has not produced final construction drawings, and that she has not paid for engineering work she was responsible to pay under the terms of the contract. Appellant seeks to subtract the amounts it paid for preliminary design drawings ($8,800) and for design development ($7,000) from the total amount it paid appellee ($38,100) for a total refund amount of $22,300.
As we have already discussed, after the modification of the contract appellant was obligated to pay the amounts charged by the outside engineers. Furthermore, appellee could not complete the final construction drawings until appellant paid the amount owed for the fees of the outside engineers, because the engineers would not give her the needed information for the drawings until their fees were paid. Therefore, appellant's argument that it owes no more money and that it is entitled to a refund of some of the money it has already paid is not persuasive.
However, there is some merit to appellant's contention, which it has asserted in several assignments of error, that equity demands that if appellee receives the full benefit of the contract through a court order that appellant pay the amount still owed under the contract terms to appellee, that appellant also is also entitled to receive the full benefit of the contract upon payment of the judgment. Therefore, appellee must either: 1) provide appellant with completed construction drawings upon receipt of the $17,200 we determined appellant still owes on the total contract price in our discussion of the third assignment of error; or 2) must accept a judgment for a lesser amount than $17,200, since she will not be entitled to her entire flat fee of $29,900 for architectural services if she does not complete her work by providing final construction drawings. If appellee chooses not to provide final construction drawings, the trial court must compute the damages owed as the total amount owed ($55,300 (architectural flat fee of $29,900 plus modification for engineering fees of $25,400) minus the value of the architectural services that have not been provided (appellee cannot charge for final construction plans that she never completes). Accordingly, appellant's sixth assignment of error is well-taken to the extent that appellee may not recover the full benefit of the contract unless appellant is also made whole upon its payment to appellee.
The judgment of the Erie County Court of Common Pleas is affirmed in part and is reversed in part. This case is remanded to the trial court for further proceedings consistent with this decision. Appellant and appellee are each ordered to pay one-half the court costs of this appeal.
Peter M. Handwork, J., Melvin L. Resnick, J. Richard W. Knepper, P.J., JUDGES CONCUR.
 ____________________________ JUDGE