NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0513n.06

No. 14-3558

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

GRANT KEATING, individually and on
behalf of all others similarly situated,

      Plaintiff-Appellant,

v.

PETERSON'S NELNET, LLC; NELNET,
INC.; and CUNET, LLC,

      Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jul 21, 2015
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

BEFORE:     DAUGHTREY, McKEAGUE, and STRANCH, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Plaintiff Grant Keating, on behalf of a putative class of plaintiffs, appeals the district court's grant of summary judgment to defendants Nelnet, Inc., Peterson's Nelnet, LLC, and CUnet, LLC, on Keating's allegation that the defendants violated provisions of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, by sending an unsolicited text message to his cellular telephone. Although Keating concedes that the defendants themselves did not send the text message, he argues that the defendants should be held vicariously liable for the illegal actions of downstream vendors. The district court held to the contrary, finding the evidence on summary judgment insufficient to establish liability. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Grant Keating, an Ohio resident, is a licensed attorney who works for the law firm that represents him in this matter. Keating alleged that he received the following text message on his cellular telephone on June 10, 2011: "Searching for a college or trade school? Get FREE education advice. Call to speak to an advisor now at 866-944-3042. Send STOP to opt out." He maintained that he did not solicit information about colleges or trade schools and did not consent to receive any such advertisements by text message on his phone. Consequently, Keating referred the matter to his attorneys, who filed suit in federal district court, alleging violations of the TCPA on behalf of the plaintiff and a putative class of similarly situated persons "who received calls on their cellular telephones from Defendants' automatic telephone dialing system without giving Defendants prior express consent." Through the ensuing discovery process, the relevant facts underlying this appeal were brought to light. Documentary and testimonial evidence revealed that defendant Nelnet, Inc., is the parent company of both Peterson's Nelnet, LLC, and CUnet, LLC, sister companies under the direction of Todd Eicher. Eicher explained that CUnet was formed to provide marketing services to higher-education institutions. Specifically, "CUnet uses various marketing media, including mobile media, in an attempt to generate potential student inquiries for its . . . clients." One such service offered by CUnet, CollegeQuest, attempted "to match prospective student candidates with higher education institutions" through a website operated for CollegeQuest.

CUnet's CollegeQuest Campaign consisted of two components—a click-to-call (CollegeQuest C2C) program and a click-to-web (CollegeQuest C2W) program. As explained by Akeel Haider, CUnet's mobile media strategist:

> The CollegeQuest C2C Campaign only was to involve graphical banner images contained in mobile-optimized web pages and/or in mobile applications used on

mobile electronic devices which would encourage the end user to "click" the image. Once the end-user clicked the banner image, the user's cell phone would open a new web browser which would be directed to a separate mobile web page. That separate web page would contain information on how to contact CollegeQuest, including a specific telephone number. The end-user could click on the telephone number to call the CollegeQuest call center directly from the user's cell phone.

\* \* \* \* \*

The CollegeQuest C2W Campaign was intended to be a mobile media marketing campaign in which graphical images were to be displayed on banner advertisements contained in the internet web browser pages and/or mobile application programs used on mobile electronic devices. The graphical marketing banners were intended to encourage the mobile device user to "click" on the graphical image to initiate the process of opening the mobile device's web browser application to a mobile web page. That mobile web page would contain an informational form which would ask the mobile device user to enter certain contact information so that the user could receive more information. The mobile device user could not call any telephone number directly from the web page.

To carry out the two campaigns, CUnet contracted with CornerBlue, a marketing company "specifically focused on mobile devices that use mobile applications or have internet web browsing capabilities." As part of that contract with CornerBlue, CUnet provided CornerBlue with the graphical banner images that CUnet had developed and that Haider referenced. CUnet made clear to CornerBlue "that the CollegeQuest C2C Campaign was not to involve the use of SMS [short messaging service] or text messages. CornerBlue also understood that it was not authorized to send SMS or text messages for the CollegeQuest C2C Campaign." In fact, "[b]ecause of the graphical nature of the banner images developed by CUnet, the images could not be used in text messages as a click to call." Similarly, "[t]he CollegeQuest C2W Campaign was purely a graphical banner campaign" and thus did not involve click-to-call telephone numbers or the sending of text messages.

CornerBlue conducted the entire CollegeQuest C2W Campaign itself, and no text messages were sent in connection with that advertising effort. Unfortunately, the CollegeQuest

C2C Campaign was not as free from misuse. Despite its contract with CUnet that prohibited the assignment, transfer, or delegation of any obligation incurred under the terms of the document without prior written consent from CUnet, CornerBlue subcontracted its click-to-call campaign obligations to AKMG, Inc., on June 2, 2011. Moreover, CornerBlue never informed CUnet of the subcontracting of the CollegeQuest C2C Campaign to AKMG. CornerBlue, however, was adamant that it never authorized AKMG to send SMS or text messages for the campaign or to publish any click-to-call campaigns using text messages or materials other than the banner images received from CUnet. Otherwise, CornerBlue controlled neither the manner and means by which AKMG performed its work nor the detail or quality of that work.

CornerBlue's subcontract with AKMG did not define the extent of CUnet's attenuation from the ultimate transmission of the text message to Keating. In fact, the evidence before the district court indicated that AKMG in turn entered into its own agreement with River City Media, LLC, whereby AKMG would supply River City Media with language to be used in an advertising campaign—the same campaign for which CornerBlue had contracted with AKMG— and River City Media would transmit that advertisement through text messaging using an auto-dialer. Matt Ferris, a River City Media representative, testified during his deposition that AKMG specifically indicated to him that the information provided by AKMG was to be sent via text messaging. Ferris stated further that although he thought that River City Media was using a list of recipients who had consented to the receipt of text messages, his company never took steps to insure that the recipients of the text messages actually had consented to receiving such advertisements.

Ferris also testified that River City Media's only correspondence regarding the campaign was with representatives of AKMG, and that no one from his company ever had dealings with

anyone from CornerBlue, from Nelnet, from Peterson's Nelnet, or from CUnet. Furthermore, Ferris was adamant that none of the defendants in this action ever authorized River City Media to send text messages as part of the advertising campaign.

In any event, upon the direction of individuals at AKMG, River City Media transmitted text messages, identical to the message received by plaintiff Keating, to an unspecified number of cellular phones. On June 10, 2011, Akeel Haider at CUnet learned that an individual had contacted the CollegeQuest call center to complain about receiving an unauthorized text message in connection with the click-to-call campaign. Haider immediately contacted Arthur Chaparyan, the co-founder and chief executive officer of CornerBlue, and asked him to investigate the situation and determine how a text message could have been sent despite CUnet's explicit directions that no such mobile-media tactics were to be employed in the CollegeQuest C2C Campaign. That same day, Haider deactivated the click-to-call campaign until he could be assured that further breaches of protocol would not occur. Over the next ten days, Haider received emails from Chaparyan "confirming that CornerBlue was not and would not be sending SMS text messages on any of the mobile media marketing campaigns." In light of that assurance, Haider reactivated the campaign on June 22, 2011.

On July 1, 2011, however, Haider was told of another complaint tendered by an individual who also had received a text message in connection with the click-to-call campaign. Haider again directed CornerBlue to investigate the breach of protocol and deactivated the CollegeQuest C2C Campaign a second time. After Chaparyan reiterated that CornerBlue would not be sending any text messages in conjunction with the campaign, Haider reactivated CollegeQuest C2C on August 10, 2011, before terminating it permanently on August 26, 2011.

On August 24, 2011, two days prior to the termination of the click-to-call campaign, plaintiff Keating filed suit in federal district court "on behalf of himself and for all other persons similarly situated . . . who received calls on their cellular telephones from Defendants' automatic telephone dialing system without giving Defendants prior express consent." In that complaint, Keating alleged that more than 40 people received the unwanted texts in violation of the provisions of the TCPA. Pursuant to the Act, the plaintiff sought damages of "actual monetary loss or $500 for each violation, whichever is greater, pursuant to 47 U.S.C. § 227(b)(3)," as well as the treble damages allowed for willful or knowing violations of the statute's prohibitions. The initial complaint named as defendants only Nelnet, Inc., and Peterson's Nelnet, LLC, but Keating later filed an amended complaint that added CUnet as a party defendant.

The defendants filed motions for summary judgment in their favor, arguing that they were not responsible for the sending of the offending texts and that neither CornerBlue, AKMG, nor River City Media were agents of the defendants or entities under their control. Prior to the district court's ruling on the summary-judgment motion, Keating voluntarily dismissed Peterson's Nelnet as a defendant, leaving only CUnet and its parent corporation, Nelnet, Inc., as potentially responsible parties.

The district court then granted the defendants' motion. In doing so, the district court concluded:

> Plaintiff has failed to provide any evidence that could support a finding that any Defendant in this case ever authorized River City to send the text messages at issue. Further[,] there is no evidence that River City was an agent of CUnet, or an agent of CornerBlue, the only entity authorized by CUnet to engage in mobile media marketing on its behalf.

From that ruling, Keating now appeals.

**DISCUSSION**

We review *de novo* the grant of summary judgment by a district court. *See Dodd v. Donahoe*, 715 F.3d 151, 155 (6th Cir. 2013). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *Id.*

**Text Messages as "Calls"**

Pursuant to the relevant provisions of the TCPA:

It shall be unlawful for any person within the United States . . . to make any *call* (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service . . . .

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added). Although the term "call" is not defined in the TCPA, the Federal Communications Commission (FCC) has ruled explicitly that the statute's prohibitions "encompass[] both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14115 (July 3, 2003).

Neither the plaintiff nor the defendants contest the inclusion of text messages in the TCPA's prohibition of unauthorized "calls" made from an automatic telephone dialing system. Nor, in light of well-established administrative-law jurisprudence, could they do so legitimately.

In *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the United States Supreme Court announced a two-step framework to be used by courts when reviewing administrative interpretations of federal law. First, a reviewing court must examine the language of the relevant statute. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, if the plain language of the statute does not reveal Congress's intent in enacting the legislation, courts must defer to "permissible construction[s]" of the statute by the administrative agency entrusted with implementing the law, *id.* at 843, that is, courts must follow an agency interpretation if the interpretation is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

It is clear that Congress did not address, or even intend to address, the treatment of text messages when considering and passing the TCPA. In fact, the first text message was not sent until December 3, 1992, almost a full year *after* the December 20, 1991, enactment of the TCPA. *See* Joanna Stern, *Happy 20th Birthday, Text Message, But You're Past Your Prime*, ABC News (Dec. 3, 2012), http://abcnews.go.com/Technology/happy-20th-birthday-text-mssage-now-past-prime/story?id=17864096. Thus, because Congress could not have addressed the relevant issue upon passage of the TCPA, we must defer to the reasonable interpretation of the Act offered by the FCC in its 2003 guidance.

One of the overriding purposes of the TCPA is to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls . . . ." S.Rep. No. 102-178, at 1 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968. It clearly was not "arbitrary, capricious, or manifestly contrary to the statute" for the commission to conclude that automated transmissions of text messages would engender the same unwanted

intrusions as automated telephone calls and should be regulated. We thus unhesitatingly afford deference to the agency holding that a text message should be treated as a "call" for purposes of the TCPA.

**Direct Liability**

Even though the defendants do not contest the proposition that the unauthorized transmission of text messages falls under the prohibitions listed in the TCPA, they do contend that they cannot be held directly liable for any statutory violation because the evidence before the district court is uncontroverted that neither Nelnet nor CUnet ever sent a text message in connection with the CollegeQuest C2C Campaign. In fact, the evidence before the court shows conclusively that River City Media, at the direction of AKMG, sent the offending text messages to Keating and to other putative class members. It thus seems clear that the district court did not err in granting summary judgment to the defendants on Keating's claim that Nelnet, Inc., and CUnet, LLC, should be held directly liable under the TCPA for the plaintiff's receipt of an unauthorized text-messaged advertisement without his consent.

**Vicarious Liability**

Direct liability, however, is not the sole basis for recovery of damages under the TCPA. The absence of any record evidence of the defendants' *direct* liability does not necessarily mean that the defendants cannot be found to be liable to Keating *vicariously* under common-law theories of actual authority, apparent authority, or ratification. Indeed, Keating argues on appeal that CornerBlue was CUnet's agent and thus had actual, or at least apparent, authority to approve River City Media's text-message campaign.

In *Charvat v. EchoStar Satellite*, 630 F.3d 459, 465 (6th Cir. 2010), we were presented with a similar issue: whether Charvat, a plaintiff who alleged that he received 30 calls from

telemarketers despite previously having listed his telephone number on the do-not-call list, could "recover damages from EchoStar, an entity that did not place any illegal calls to him but whose independent contractors did." Finding ambiguity in the wording of the statute regarding whether a company may be held liable for calls (or text messages) sent "on its behalf," the *Charvat* court referred the matter to the FCC for its advice on the issue. In response, the commission issued Declaratory Ruling 13-54, *In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of America, and the States of California, Illinois, North Carolina, and Ohio for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules*, 28 FCC Rcd. 6574 (May 9, 2013) (*Dish Network*).

Subsection 47 U.S.C. § 227(b), the provision of the statute that Keating alleges the defendants violated, simply prohibits "any person" from making or initiating a "call" (except an emergency call or a call made pursuant to the prior express consent of the called party) by using any automated telephone dialing system. However, even though persons—like the defendants here—may not have "made" or "initiated" the calls or text messages that actually are placed by third parties, the FCC concluded that such defendants still "may be held vicariously liable . . . for TCPA violations . . . under a broad range of [federal common-law] agency principles, including not only formal agency, but also principles of apparent authority and ratification." *Dish Network*, 28 FCC Rcd. at 6584. As the commission explained:

> The classical definition of "agency" contemplates "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control." Potential liability under general agency-related principles extends beyond classical agency, however. A principal may be liable in circumstances where a third party has apparent (if not actual) authority. Such "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." Other principles of agency law may support liability in particular cases. For example, a seller may be liable

> for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits. Such ratification may occur "through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences."

*Id.* at 6586-87 (footnotes omitted).

Keating spends much of his appellate brief seeking to justify imposition of vicarious liability upon CUnet based upon an assertion that CornerBlue was an agent of the defendants. This line of attack on the district court's judgment is unavailing for a number of reasons. First, the clear wording of the operative contract between CUnet and CornerBlue states "that the parties to th[e] Agreement are independent contractors" and that CornerBlue has "no authority to make or accept any offers or representations on [CUnet's] behalf." Such contractual language flies directly in the face of the classic definition of common-law agency: "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency* §1.01 (2006). Because CornerBlue was never authorized to act on CUnet's behalf, but rather only pursuant to contractual obligations, no principal-agent relationship was established.

Second, and most damaging to the plaintiff's position, the improper acts that Keating seeks to impute to CUnet through that defendant's business relationship with CornerBlue were not performed by CornerBlue at all. Instead, all evidence in the record points to the fact that River City Media sent the unauthorized text messages to the putative plaintiff class—without the knowledge or acquiescence of CornerBlue or of CUnet. Moreover, Keating has offered no evidence to support his bald assertion that River City Media could have been acting at CUnet's behest. To the contrary, the evidence adduced by the parties makes clear that CUnet and River City Media were unaware of each other's existence until the filing of this lawsuit. Deposition

testimony established: that CUnet never contracted with either AKMG or River City Media;  that CUnet was not aware that CornerBlue had subcontracted with AKMG, or that AKMG then subcontracted its responsibilities to River City Media; that River City Media never was given authority by the defendants to send text messages; that River City Media's only correspondence of any kind regarding the click-to-call campaign was with AKMG, not with the defendants; and that River City Media never had any contact of any sort with Nelnet, Peterson's Nelnet, CUnet, or even CornerBlue.

**Actual Authority of an "Agent"**

The fact that CornerBlue, AKMG, and River City Media cannot be considered agents of the defendants necessarily dooms Keating's claims based on an expressed-agency theory against Nelnet and CUnet.  Likewise, the plaintiff cannot succeed against the defendants on his TCPA claim by relying on the agency concepts of actual authority or apparent authority, even if CornerBlue or River City Media were to be considered an agent of CUnet.  The *Restatement (Third) of Agency* explains that "[a]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Id.* at § 2.01.  Despite the fact that CornerBlue clearly did not send the text messages at issue in this case, Keating argues that CUnet nevertheless can be deemed liable for any texts sent as a result of CUnet's contract with CornerBlue.  In support of this allegation, Keating points to the fact that CUnet had entered into an identical contract previously with a company by the name of Mivani, and that the CUnet-Mivani advertising campaign admittedly involved the transmission of text messages to individuals who consented to receipt of such information.  Thus, claims Keating,

CUnet must have envisioned the possibility that text-messaging would be used in the CollegeQuest C2C Campaign as well.

The mere fact that the CornerBlue and Mivani contracts were functionally identical cannot, however, justify the conclusion that Keating seeks to draw from that fact. First, neither contract made explicit mention of text-messaging, despite the fact that the plaintiff argues that the mere use of the term "mobile advertising" in the contracts implies approval of text-messaging campaigns. Second, all parties to the contract between CUnet and CornerBlue stated unequivocally that text messaging was *not* to be used in the CollegeQuest C2C Campaign, a restriction not present in the dealings between CUnet and Mivani. In fact, Chaparyan, CornerBlue's chief executive officer, testified that only once before had CornerBlue authorized its downstream vendors to send text messages, that the company had not done so since, and that it did not do so in the CollegeQuest C2C Campaign. Chaparyan supported that assertion by referencing the advertising platform for CornerBlue's contract with CUnet that specifically outlawed all "SMS traffic" during the campaign. Finally, and most tellingly, CUnet directed that its CollegeQuest C2C Campaign was to be conducted through the use of graphical advertising banners, images that Chaparyan explained "could not be used in text messages as a click to call." The record thus contains absolutely no evidence whatever that would support a conclusion that CUnet conferred *actual* authority upon CornerBlue or any downstream vendor to use text messages during the CollegeQuest C2C Campaign.

**Apparent Authority of an "Agent"**

Nor is there any evidence to support Keating's assertion that he reasonably could have believed that CornerBlue, AKMG, or River City Media possessed apparent authority from CUnet to send unauthorized text messages as part of the advertising campaign. The *Restatement (Third)*

*of Agency*, section 2.03, defines "apparent authority" as "the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Stated differently, under the theory of apparent authority, a principal will incur liability for the acts of an "agent" if the principal "held the agent out to third parties as possessing sufficient authority to commit the particular act in question, and there was reliance upon the apparent authority." *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998). Thus, "[t]he apparent power of an agent is to be determined by the act *of the principal and not by the acts of the agent . . .* [.]" *Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 663 (6th Cir. 2005) (quoting *Master Consol. Corp. v. BancOhio Nat'l Bank*, 575 N.E.2d 817, 822 (Ohio 1991)).

The very formulation of the contours of apparent authority, when viewed in light of the evidence before the district court, serves to validate the district court's determination that the defendants are no more vicariously liable to Keating under a theory of apparent authority than they are under an actual-authority framework. As has been stated previously, nothing in the record before this court reasonably can be construed to indicate that the defendants held out to third parties, or to anyone else, that CornerBlue was authorized to send text messages to individuals who had not agreed to receive them. To the contrary, CUnet's campaign to use graphical banners to generate interest in their "product" actually foreclosed the possibility that such text messages would be sent with CUnet's approval.

Lastly, in its *Dish Network* declaratory ruling, the FCC explained:

[A] seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer

was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*Dish Network*, 28 FCC Recd. at 6592 (footnote omitted).  This administrative explication of the extent of a principal's vicarious liability under common-law agency theories again highlights the deficiencies in Keating's claim against the defendants.  First, "the unauthorized conduct" in this matter—the sending of the text messages—was not done by a telemarketer "otherwise authorized to market on the seller's behalf."  Rather, the text messages were sent by River City Media, a company unknown to the defendants, who also had no knowledge that CornerBlue had subcontracted its responsibilities.  Second, Keating offered no evidence that the defendants had any information that would have suggested that unauthorized text messages were being sent until such time as the company received complaint calls alerting them to that fact.  Indeed, given that the defendants contracted with CornerBlue for an advertising campaign that used graphical banners that made text-messaging impossible, the defendants could not have envisioned the breach in protocol that occurred.  Third, upon receiving information that offending texts had been transmitted, CUnet immediately suspended the campaign and reinstated it only after being assured that CornerBlue did not and would not send text messages.  A second complaint resulted in a second deactivation of the campaign for more than one month.  Only after receiving additional reassurances from CornerBlue that the campaign would be handled as envisioned by the defendants was a second reactivation authorized before the campaign was suspended entirely.

Nothing in the record before this court gives any indication that the defendants authorized a third party to conduct a text-messaging campaign.  Furthermore, Keating has offered no evidence to show that the defendants had any advance knowledge of improper activities by their subcontractor's subcontractor's subcontractor.  When those misdeeds were brought to light, CUnet took immediate and appropriate action to suspend the campaign until it received

assurances from CornerBlue that such missteps would not be repeated. The district court thus did not err in concluding that the defendants also were not vicariously liable to Keating under an apparent-authority theory.

## CONCLUSION

Plaintiff Keating asserts that allowing the defendants in this case to escape liability for the text messages sent by River City Media is tantamount to drawing a roadmap for unscrupulous telemarketers on how to circumvent the protections afforded consumers under the TCPA. Such a concern would be legitimate if a company were to be so lax in the conduct of an advertising campaign that it took no precautions to ensure compliance with relevant statutes and regulations. But inattention to legal restrictions is not present in this case. There is no dispute that neither CUnet nor Nelnet sent any text messages in connection with the CollegeQuest C2C Campaign. Moreover, the defendants' subcontractor, CornerBlue, also did not send the improper texts and, in fact, could not do so because CUnet supplied CornerBlue with only graphical banners for the campaign—banners that were incompatible with text transmissions. When CornerBlue in turn subcontracted with AKMG to run the campaign—an assignment that was not revealed to CUnet—even CornerBlue took the precautionary step of noting in its advertising platform that text messages were prohibited. Furthermore, when informed of breaches in the campaign's protocol, CUnet took immediate and appropriate, albeit ultimately ineffective, steps to ensure that such missteps were not repeated.

Keating has failed to identify any genuine dispute of fact that possibly could justify a finding that River City Media was an agent of the defendants or that the offending party had either actual or apparent authority to act as it did on the defendants' behalf. Thus, we conclude

that, in light of the facts before it, the district court appropriately granted summary judgment to

the defendants on Keating's TCPA claim, and we AFFIRM the judgment of the district court.