Master Consolidated Corporation, Appellant,
*v.* BancOhio National Bank, Appellee.

[Cite as *Master Consolidated Corp. v. BancOhio
Natl. Bank* (1991), 61 Ohio St.3d 570.]

(No. 90–1388—Submitted April 17, 1991—Decided August 28, 1991.)

572

*Shulman & Hall, L.P.A., Thomas G. Kramer* and *Elizabeth O. M. Troxell, Talbott & Ducker* and *John T. Ducker,* for appellant.

*McFadden & Winner, Joseph C. Winner* and *Melodee S. Kornacker,* for appellee.

HOLMES, J.   Master has appealed to this court on the grounds that Banc-Ohio, as trustee, acted negligently in disbursing monies from the bond construction fund without conducting an independent investigation of the propriety of Glueckert's request for disbursement.   Specifically, Master argues that BancOhio dealt with Master's purported agent, Glueckert, at its own risk, that BancOhio should have exercised diligence and prudence to ascertain the authority of such purported agent prior to disbursing bond proceeds, and that because it failed to do so, BancOhio should reimburse Master for the misdirected funds.   Before addressing this issue, we must initially consider whether Glueckert had the authority to request the disbursement of bond proceeds from BancOhio and to direct the payment of these proceeds.   After

reviewing the pertinent documents and peculiar circumstances of this case, we find that Glueckert did have authority to bind Master.

The relationship of principal and agent, and the resultant liability of the principal for the acts of the agent, may be created by the express grant of authority by the principal. Absent express agency, the relation may be one of implied or apparent agency. As the Supreme Judicial Court of Maine observed, " * * * Express authority is that authority which is directly granted to or conferred upon the agent or employee in express terms by the principal, and it extends only to such powers as the principal gives the agent in direct terms; and the express provisions are controlling where the agency is expressly conferred. * * * " *Stevens v. Frost* (1943), 140 Me. 1, 7, 32 A.2d 164, 168. Several key documents contain evidence of an express agreement between Glueckert and Master and thereby delineate the authority to be exercised by Glueckert at the bond closing.

Glueckert, as Executive Vice President of Master, was authorized pursuant to a resolution of Master's board of directors to execute and deliver, on Master's behalf, the bond agreement, a promissory note, a mortgage and security agreement and "such other instruments and agreements, and to perform such other acts, as *in his judgment* may be necessary or appropriate in order to effectuate the issuance of the Bonds and the intent and purpose of the foregoing resolutions." (Emphasis added.)[3] In accordance with such express authority, Glueckert executed Certificate # 1 at the bond closing which requested BancOhio to disburse bond proceeds in the total amount of $1,423,290.10. Of this sum, $489,532.68 was wired to Futra.

Master urges this court to find that the foregoing language in the resolution of Master's Board of Directors narrowly circumscribed the authority of Glueckert to act on behalf of Master at the bond closing. We disagree with this assertion.

Certainly, Master's insistence cannot be reconciled with any reasonable interpretation of the board resolution's language. In addition to providing Glueckert with specific grants of authority, the resolution broadly empowered this officer of Master to exercise his own professional judgment in deciding what further action is "necessary or appropriate in order to effectuate the issuance of the Bonds * * *." The decision as to how those funds should be

---

3. Charles D. Lowe, as Secretary of Master, certified a resolution giving Glueckert authority to sign the bond agreement and to perform other acts in connection with the issuance of bonds. Lowe authored an opinion letter dated August 31, 1983, wherein the following was set forth: "The execution and delivery of the Loan Agreement [meaning the bond agreement], Note, Mortgage and User's [Master's] Certificate have been duly authorized by all required corporate action, and each has been properly executed and delivered on behalf of the User."

applied and utilized was the prerogative of Master's management in the exercise of its judgment, and Master delegated the authority to make that decision to Glueckert pursuant to a valid resolution. It should be noted that there exists in the law a general presumption that a corporation's management, in making business decisions, acts on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company. Absent an abuse of discretion, courts will defer to corporate business judgment. *Gries Sports Enterprises, Inc. v. Cleveland Browns Football Co.* (1986), 26 Ohio St.3d 15, 26 OBR 12, 496 N.E.2d 959. This is no less true when the authority to make those decisions is expressly conferred upon the corporation's agent as in this case. Essentially, an agent is in fact authorized to do "what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts." 1 Restatement of the Law 2d, Agency (1958), Section 33.

The *bond agreement* entered into between BancOhio and Master[4] provided that BancOhio, acting as trustee, was to "disburse funds from the Construction Fund to pay for all items within the definition of 'Cost of the Project'." "Cost of the Project" was defined to include, *inter alia:*

"(f) All items of expense not elsewhere specified in this Section as may be necessary or incident to: (i) the authorization, issuance and sale of the Bonds; (ii) the acquisition, improvement, equipping and furnishing of the Project [*i.e.,* the Master plant]; and (iii) the financing thereof; and

"(g) Reimbursement to Borrower [Master] *or those acting for it* for any of such costs paid by them, whether before or after the execution of this Agreement." (Emphasis added.)

We conclude that the above language found within the resolution of the Master board of directors, along with the bond agreement, granted to Glueckert (the Executive Vice President of Master) the express authority to direct BancOhio as to the disbursement of the bond funds.

We find that in interpreting Glueckert's express grant of authority, it was reasonable for BancOhio to conclude that Glueckert had such authority to

---

4. The bond agreement was made and entered into as of August 1, 1983 between the county of Montgomery (the "lender") and Master Consolidated Corporation (the "borrower"). Concurrently with the issuance of the bonds, the lender assigned to the trustee (BancOhio) all of its rights as lender under the bond agreement and related documents to BancOhio for the benefit of the bondholders. Thus, although the bond agreement was originally entered into between Montgomery County and Master, BancOhio was assigned the rights of Montgomery County as lender and became both lender and trustee.

direct BancOhio to disburse bond proceeds and wire the disputed funds to Futra.

Although we hold that the transfer of funds to Futra was reasonably within the scope of the express authority conferred upon Glueckert by the board of directors' resolution of August 1, 1983, we also hold that the appellate court was correct in finding that Glueckert had apparent authority to execute Certificate # 1 and to direct BancOhio to wire a portion of the proceeds to Futra.

"Apparent authority" has been defined as " * * * the power to affect the legal relations of another person by transactions with third persons * * * arising from * * * the other's manifestations to such third persons." 1 Restatement of the Law 2d, Agency (1958) 30, Section 8. This court, in *Miller v. Wick Blg. Co.* (1950), 154 Ohio St. 93, 42 O.O. 169, 93 N.E.2d 467, paragraph two of the syllabus, held that:

"Even where one assuming to act as agent for a party in the making of a contract has no actual authority to so act, such party will be bound by the contract if such party has by his words or conduct, reasonably interpreted, caused the other party to the contract to believe that the one assuming to act as agent had the necessary authority to make the contract." See, also, *Cascioli v. Central Mut. Ins. Co.* (1983), 4 Ohio St.3d 179, 181, 4 OBR 457, 459, 448 N.E.2d 126, 128.

Further, this court in *General Cartage & Storage Co. v. Cox* (1906), 74 Ohio St. 284, 294, 78 N.E. 371, 372, explained that, " '[w]here a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages, and the nature of the particular business, is justified in assuming that such agent is authorized to perform on behalf of his principal a particular act, such particular act having been performed the principal is estopped as against such innocent third person from denying the agent's authority to perform it.' * * * "

Thus, in order for a principal to be bound by the acts of his agent under the theory of apparent agency, evidence must affirmatively show: " ' * * * (1) [t]hat the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, and (2) that the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority. The apparent power of an agent is to be determined by the act of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of the authority and not where the

agent's own conduct has created the apparent authority. * * *' " *Logsdon v. ABCO Constr. Co.* (1956), 103 Ohio App. 233, 241–242, 3 O.O.2d 289, 293, 141 N.E.2d 216, 223; *Ammerman v. Avis Rent A Car System, Inc.* (1982), 7 Ohio App.3d 338, 7 OBR 436, 455 N.E.2d 1041; *Blackwell v. Internatl. Union, U.A.W.* (1983), 9 Ohio App.3d 179, 9 OBR 289, 458 N.E.2d 1272.[5]

In reviewing the record here, we hold that the evidence supports the conclusion that Master's conduct, reasonably interpreted by BancOhio, caused BancOhio to believe that Glueckert had the authority to execute requests for bond proceeds and to direct BancOhio's payment of the proceeds to the designated parties. Through the following documents, Master communicated to BancOhio that Glueckert was its authorized agent and that BancOhio, as lender and trustee, could rely upon Glueckert's authority without further investigation.

The bond agreement reads in pertinent part:

"Section 8.2. Designated Representatives. Lender and Borrower [Master] shall each designate one or more persons, to act for Lender and Borrower respectively in carrying out the provisions of this Agreement and the Indenture. *Any communications in writing from any such designee shall be entitled to be treated as the authorized act of the respective designor and Lender, Borrower and the Trustee may fully rely and act upon the authority of such communications.* Such designees may be changed from time to time by Lender or Borrower by appropriate resolution and notice thereof given in writing to the other and to the Trustee. Lender hereby designates the present President of the Board of County Commissioners of Lender and *Borrower hereby designates Richard F. Glueckert to serve initially hereunder."* (Emphasis added.)

Another highly relevant portion of the bond agreement explains the duties of the lender and trustee (both being BancOhio):

---

5. A comment in 1 Ohio Jury Instructions (1990) 200, Section 15.10, distinguishes apparent authority from agency by estoppel:

"Estoppel and apparent authority are similar in that they are based on the underlying principle that a person shall be bound by his words or deeds. They are distinguished as follows: *estoppel* is essentially the principle that a person must compensate another for any change of position (loss) induced by reliance on what the person said or otherwise manifested, because it would be unjust to allow him to deny the truth of his words or manifestations; *apparent authority* is based on the objective theory of contracts, and arises when a person manifests to another that an agent or third person is authorized to act for him, irrespective of whether the person really intended to be bound, of whether the person told the same thing to the agent, and of whether the other person changed his position." See, also, 1 Restatement of the Law 2d, Agency (1958), Section 8, Comment *d.*

"Section 4.5. General Provisions Regarding Disbursements. Anything herein to the contrary notwithstanding, Lender's and the Trustee's obligations hereunder shall be confined to the funds in the Construction Fund and in no event shall Lender or the Trustee be obligated to expend funds other than those in the Construction Fund. *The sole obligation of Lender under Sections 4.3 and 4.4 hereof* [regarding disbursements] *shall be to cause the Trustee to disburse funds upon receipt of the certificates and other instruments described therein. The Trustee may rely fully on such certificates and other instruments and shall not be required to make any independent investigation in connection therewith.* The Trustee may, in its reasonable discretion, excuse the inability of Borrower or the Supervising Engineer to make any representation or to express any opinion or to undertake any obligation required to be in such certificates or other instruments if the Trustee reasonably determines that Borrower or the Supervising Engineer, as the case may be, is acting in good faith and that insistence on the omitted representation, opinion, or obligation would not be in the best interests of the Bondholders. All requests for draws from the Construction Fund shall be submitted on the form attached hereto as Exhibit 'C', and shall have attached thereto the items specified therein." (Emphasis added.)

In addition to the above-cited sections of the bond agreement, the Secretary of Master, Charles D. Lowe, certified that Master's Board of Directors had adopted the resolution of August 1, 1983 which gave Glueckert the express authority to execute documents and perform other acts in connection with the issuance of the bonds. Additionally, Lowe's opinion letter dated August 31, 1983 assured BancOhio that the bond agreement and other documents were "duly authorized by all required corporate action * * *."

The above-mentioned language of the bond agreement and Lowe's two representations of August 1, 1983, as well as the resolution granting Glueckert express authority, satisfy the requirements of the test for apparent authority.

In the case *sub judice*, Master would have this court characterize the events which led to the disbursement of bond proceeds as being so suspicious as to call attention to the impropriety of the transaction such that BancOhio could only have been negligent in releasing the bond proceeds and directing their payment to Futra. We cannot adopt such a characterization. BancOhio complied with the terms of the bond agreement and trust indenture.

Master contends that BancOhio breached its obligations to Master under the trust indenture by failing to make an independent investigation of the propriety of the request for disbursement. Such an assertion disregards the plain

language of the trust indenture. The relevant portions of the trust indenture are:

"Section 1101. *Acceptance of the Trusts.* The Trustee hereby accepts the trusts imposed upon it by this Indenture and agrees to perform such trusts as would an ordinarily prudent trustee under a corporate mortgage, but only upon and subject to the following express terms and conditions:

"(a) The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees but shall be answerable for the conduct of the same in accordance with the standard specified above, and shall be entitled to advice of counsel concerning all matters of trusts hereof and the duties hereunder, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trusts hereof. *The Trustee may act upon the opinion or advice of any attorney (who may be the attorney or attorneys for the Issuer or User [Master]), approved by the Trustee in the exercise of reasonable care. The Trustee shall not be responsible for any loss or damage resulting from any action or non-action in good faith in reliance upon such opinion or advice.*

" * * *

"Section 1111. *Trustee Protected in Relying Upon Resolutions, etc.* The resolutions, opinions, certificates and other instruments provided for in this Indenture may be accepted by the Trustee *as conclusive evidence of the facts and conclusions stated therein and shall be full warrant, protection and authority to the Trustee for the release of any property, the withdrawal of any monies, or the taking of any other action by the Trustee as provided hereunder.*" (Emphasis added.)

Section 8.2 of the bond agreement specifically designated Glueckert as Master's authorized representative to request disbursements from the bond construction fund. The cornerstone of the agreement between the trustee and the borrower is that the trustee can fully rely on the representations of the borrower's designated representative.

In the express language of section 8.2 of the bond agreement, Master held Glueckert out to be its designated agent and BancOhio cannot be charged with lack of reasonable diligence and prudence for relying on that language and other documents. In fact, BancOhio was *entitled* to rely on Certificate # 1 and Glueckert's direction to disburse a portion of the proceeds to Futra without making an independent investigation. With regard to disbursements, BancOhio's sole obligation as trustee was to disburse funds upon receipt of properly executed certificates. Its duty was ministerial, not discretionary.

As indenture trustee, BancOhio received the contractually specified document executed by the contractually designated agent of Master and responded by distributing funds as it was obligated to do.

Moreover, Lowe's opinion letter dated August 31, 1983 reasonably allows BancOhio to rely upon Glueckert's request for disbursement as being duly authorized by all required corporate action. BancOhio relied in good faith upon this letter as well as the bond agreement which designated Glueckert as the representative of Master.

In light of the special business relationship enjoyed by Master and Futra, the mere routing of a substantial sum from the bond construction fund from a wholly owned subsidiary to its parent does not raise the specter of an unauthorized gift or loan. Since neither the bond agreement nor the trust indenture specified exactly how reimbursement to Master was to be made, the funds could legitimately have been intended for temporary deposit into an interest-bearing cash account of Futra for redistribution to or on behalf of Master. This court is unwilling to impose on the indenture trustee a duty of inquiry that operates to override the provisions of a trust indenture. If Master and BancOhio had intended to prevent this sort of transaction, the trust indenture should have so stated.

Based upon all of the foregoing, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY and H. BROWN, JJ., concur.

DOUGLAS, J., dissents without opinion.

WRIGHT and RESNICK, JJ., dissent.

WRIGHT, J., dissenting. This case concerns the conversion of corporate funds generated through the issuance of industrial development bonds. The theft occurred in the open, at the bond closing, when the indenture trustee, BancOhio, fulfilled a request for an unlawful disbursement. I believe that BancOhio breached its contractual obligations to Master Consolidated Corporation ("Master"), thereby facilitating the theft. Therefore, I respectfully dissent from the judgment and opinion of the majority.

I

Some background on the various parties to this affair and the nature of the transaction is necessary to an understanding of BancOhio's actions.

Prior to April 1983, what was to become the business of Master was a division of the Koehring Company, a publicly owned corporation. Curtis W. Roney, a business consultant then with Philips Industries, Inc., became aware that Koehring was interested in selling a portion of its business in Dayton. Roney presented this business opportunity to Philips; however, Philips was not interested. Roney remained interested, left Philips, and, with the assistance of BancOhio and a Dayton area business assistance program, worked out a financing package whereby Roney would purchase this division of Koehring.

By chance, Roney spoke with Jack Hereth about his desired purchase from Koehring. Hereth owned Futra Industries, a holding company for several businesses, including the investment banking company of Hereth, Orr & Jones, Inc. ("HOJ"). The proposed acquisition from Koehring interested Hereth and, instead of Roney making the purchase, Roney and Hereth arranged that Futra would make the purchase and Roney would run the new business. Roney believed Futra was the better purchaser because of its supposedly better resources and ability to infuse capital. Futra, however, was heavily leveraged.

To effectuate the purchase, Futra incorporated Master to create the corporate entity to purchase the necessary assets from Koehring; BancOhio remained in the transaction as the principal source of financing; and a closing date was set to consummate the purchase.

The purchase was to be financed in two parts. Master was to purchase the fixed assets through loans from BancOhio secured by the fixed assets with the difference between the loan amount and the fixed assets' value to be made up by a capital infusion by Futra into Master, which was as of then without capital. The remaining amount of the purchase price was to consist of a subordinated note from Master to Koehring.

In late April 1983, the purchase of Master's assets from Koehring closed. When the time came for Master to cover its share of the fixed assets purchase, the segment not intended to come from BancOhio, Futra balked. Futra's representatives said it would be inconvenient for Futra to put any money into Master at that time. In order to save the deal, Master instead drew upon a line of credit extended by BancOhio to cover the remainder of the fixed assets purchase price. Thus it was that Master began its business, with one hundred percent debt financing. Shortly after Master purchased Koehring's assets, BancOhio's commercial loan department, the financier of the purchase, recommended Master to its trust department as a possible candidate for an industrial development bond offering. The proceeds from this offering were designed to pay off the loan from BancOhio, generate funds required for

additional purchases of plant and equipment, and provide additional working capital to Master.

The bond issuer was Montgomery County, Ohio; however, under the provisions of R.C. Chapter 165 and the loan agreement, the county did not lend its credit to the offering. The other parties to the issuance were BancOhio as indenture trustee (the keeper and disburser of the funds), Master as the recipient of the bond sales revenues through a loan from the issuer, Futra as guarantor of the bonds, and HOJ as the underwriter of the bonds.

The offering statement for these bonds clearly specified the expected uses for the revenue from the sale of the bonds. Out of the $2,250,000 issuance, $700,000 was to go to Master to reimburse it for the April purchase of plant and equipment from Koehring (originally funded by BancOhio), $500,000 was to go to Master to reimburse it for acquisition of new machinery (also part of the BancOhio loan), and $396,710 was to go to Master as additional working capital. The outstanding balance was to go as follows: $250,000 as bond reserves held by the trustee, $140,000 to Futra for expenses occurred in this project, and the balance in closing and underwriting expenses.

## II

BancOhio's obligations as indenture trustee were governed by the laws of the state of Ohio, by the trust indenture to which it was a party, and the loan agreement between Montgomery County and Master referenced in the indenture. The laws of Ohio found in R.C. Chapter 165 and referenced in relevant part in the loan agreement state generally that industrial development bonds are intended solely for the benefit of Ohio industry by supplying a source of capital to Ohio businesses, thereby providing jobs and economic development within the state. See R.C. 165.02 and 165.03.

The trust indenture and the loan agreement more specifically set forth BancOhio's obligations. In relevant part, the loan agreement, binding on BancOhio by reference in the trust indenture, provided as follows:

"*Section 4.4. Other Items Constituting Cost of the Project.* The indenture shall require the Trustee to disburse funds from the Construction Fund and to pay for *all items within the definition of 'Cost of the Project',* other than those provided for in Section 4.3, upon receipt by the Trustee of (a) a certificate signed by *a Designated Representative* of Borrower requesting a specified sum of money, describing in *reasonable detail* such items which form the basis for said request, stating that said sum does not exceed the cost to Borrower of such items, that no part of such costs has previously been made the basis of any request for the withdrawal of such Construction Fund monies, that each element of such cost is included within the definition of

'Cost of the Project' and is properly payable from the Construction Fund, and that the Project is subject to no lien or encumbrance other than the Permitted Encumbrances or any liens which have been bonded or which Borrower otherwise has a right to contest in accordance with the requirements of the Mortgage; (b) the certificate of the·*Accountant* required by Section 4.5 hereof." (Emphasis added.)

Section 4.5, upon which the majority relies, provided protection to the trustee for failure to follow Section 4.4: " * * * The Trustee may, in its reasonable discretion, excuse the inability of Borrower or the Supervising Engineer to make any representation or to express any opinion or to undertake any obligation required to be in such certificates or other instruments if the Trustee *reasonably determines* that Borrower or the Supervising Engineer, as the case may be, is acting in *good faith and that insistence on the omitted representation, opinion, or obligation would not be in the best interests of the Bondholders.* All requests for draws from the Construction Fund shall be submitted on the form attached hereto as Exhibit 'C', and shall have attached thereto the items specified therein." (Emphasis added.)

Master's designated representative at the bond closing was Richard F. Glueckert III, the President of Futra. He was also designated Executive Vice President of Master by a resolution of Master's Board of Director[s]—that being Hereth sitting alone. Glueckert was the only representative of Master at the closing.

At the closing and armed with the board resolution empowering him to act on behalf of Master, Glueckert requested a draw on behalf of Master totalling $1,423,290.10, $850,467.32 of which was to be paid to BancOhio and $489,-532.68 to Futra. Glueckert attached an affidavit to the request stating that the funds to be paid to BancOhio and Futra covered money Master expended in the April 23, 1983 purchase of Master's assets. However, BancOhio was shown no documentation as to why Futra should receive money beyond the $140,000 originally estimated for it to receive.

While much of the argument and discussion in this case has centered on whether BancOhio negligently disbursed funds, BancOhio's duties were in contract. The first question then is whether BancOhio's disbursement of funds to Futra without documentation breached the loan agreement.

The answer must be yes: in no way, under the facts of this case, could BancOhio "reasonably determine[ ]" that the draw was requested in good faith and was properly certified. BancOhio knew of Master's financial circumstances and *knew that Master had never borrowed any money from Futra to purchase its assets from Koehring.* (BancOhio knew this, because it had financed that acquisition itself just four months previously.) BancOhio was

fully aware of the estimated disbursement of funds, which, with the exception of the additional $349,532.68, went according to the offering statement. BancOhio was also aware of Futra's financial condition and of Futra's absolute control of Master's board. Despite this knowledge and the lack of documentation supporting the disbursement request, BancOhio gave Futra $349,532.68 of Master's funds. As a matter of law, BancOhio could not have reached the conclusion that the requested disbursement was made in good faith. Therefore, BancOhio breached its contract with Master.

## III

In closing I am compelled to comment on the statutory scheme under which industrial development bonds are issued. These bonds exist in a realm with little regulation. They are issued under the intrastate offering exemption of Section 3(a)(2) of the Securities Act of 1933, as amended, Section 77c(a)(2), Title 15, U.S. Code, and are also exempted from regulation under Ohio's securities laws found in R.C. Chapter 1707. R.C. 1707.02(K). Consequently, as R.C. Chapter 165 contains little to no regulation of the securities issuance, these bonds are issued almost devoid of regulation.

This case is a prime example of the danger of such a system. The company responsible for paying the principal and interest on these bonds and the underwriter of the bonds are wholly owned by the guarantor of the bonds. The company, Master, was one hundred percent debt financed and the guarantor-parent was heavily leveraged and cash poor. Without being presented with claims brought by bondholders to whom the trustee actually owes a fiduciary duty, we are not required to determine the extent of the indenture trustee's duty to regulate these bond issues. I sincerely hope the General Assembly will take a long look at the lack of investor protection contained in R.C. Chapter 165 and accordingly respond by adding some investor protection to the Chapter.

RESNICK, J., concurs in the foregoing dissenting opinion.