[Cite as *Cintas Corp. v. Findlay Chrysler Dodge Jeep Ram, Inc.* , 2018-Ohio-455.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

CINTAS CORPORATION,

    PLAINTIFF-APPELLEE,               CASE NO.  5-17-14

    v.

FINDLAY CHRYSLER DODGE,
JEEP, RAM, INC.,                    O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Hancock County Common Pleas Court
Trial Court No. 2016 CV 00021

**Judgment Affirmed**

Date of Decision:  February 5, 2018


APPEARANCES:

    *Ian A. Weber* **for Appellant**

    *Michael S. Clawson* **for Appellee**

Case No. 5-17-14

**ZIMMERMAN, J.,**

{¶1} This appeal is brought by Findlay Chrysler Dodge, Jeep, Ram, Inc., Defendant-Appellant herein, from the judgment of the Hancock County Court of Common Pleas, finding in favor of Cintas Corporation, Plaintiff-Appellee, in a breach of contract action. On appeal, Appellant asserts that the trial court abused its discretion: 1) by finding that there was a valid contract and by finding that its employee, Justin Lobdell, had the apparent authority to enter into the contract that is the subject of this case; 2) by enforcing the liquidated damages clause in the contract; and 3) by failing to award appropriate damages by permitting the Appellee to collect under the contract's liquidated damages clause. For the reasons that follow, we affirm the decision of the trial court.

*Factual Background*

{¶2} The Cintas Corporation ("Cintas" or "Appellee") is a foreign corporation with a business location in Perrysburg, Ohio that offers custom uniforms to businesses for rent or for purchase. Findlay Chrysler Dodge, Jeep, Ram, Inc. ("Appellant") is an automobile dealership located in Findlay, Ohio.

{¶3} In September or October of 2015, Ryan Caudill ("Caudill"), a Cintas Sale Representative, contacted Appellant's business to discuss a uniform service

-2-

contract.[1]   Caudill contacted Justin Lobdell ("Lobdell"), Appellant's Service Manager, to arrange a time to discuss such a contract.

**{¶4}** Thereafter, Caudill and Lobdell met at Appellant's dealership wherein Lobdell advised Caudill that Appellant had an existing service contract with City Laundry for towels, mats, and rugs, which Appellant desired to continue.  However, Lobdell informed Caudill that Appellant was seeking a new style of business uniform, and therefore, was interested in pursuing a service contract with Appellee.  As a result of their meeting, Caudill and Lobdell commenced negotiations for Appellee to provide Appellant with business uniforms.  As part of negotiations, Lobdell provided Caudill with a copy of an invoice from City Laundry so Caudill could analyze its pricing structure.  On October 14, 2015, Caudill and Lobdell finalized negotiations by entering into a sixty (60) month uniform service contract.

**{¶5}** Testimony (at trial) revealed that Lobdell reviewed the service contract electronically on a touch screen tablet furnished him by Caudill.  At trial, Caudill testified that after Lobdell examined the agreement on the tablet, Caudill asked Lobdell if he had any questions, and Lobdell responded in the negative.  Then, Caudill checked the box on the service contract indicating that Lobdell had read the

---

[1] For ease of analysis, we use "contract" and "agreement" interchangeably.

terms and conditions of the contract. Lobdell then signed the agreement electronically on October 14, 2015.[2]

**{¶6}** After entering into the service contract, Caudill returned to Appellant's dealership several times to measure its employees for uniforms. Caudill testified that during his visits he always wore a shirt that identified him as a Cintas employee. Further, Caudill testified that during one of his visits at the dealership he met with Nick Brunotte ("Brunotte"), Appellant's Operations Director, and discussed the process of measuring employees for uniforms. At no point during the contract negotiations or during the uniform fitting process did Lobdell, Brunotte, or any other employee of Appellant question Caudill's status as a Cintas representative; for being on the premises; or for measuring uniforms for Appellant's employees.

**{¶7}** After completing his measurements, Caudill ordered and delivered the new uniforms to the dealership. However, after the first delivery, Lobdell requested Caudill to provide specialized "Mopar" shirts for the employees because the dealership owner wanted a different style shirt. Further, and as part of the service contract, lockers bearing Cintas' logo were delivered and installed on November 4, 2015 by Appellee at Appellant's dealership to house the uniforms.

---

[2] Lobdell denied this chain of events at trial, claiming that he was pressured into signing the contract and that he never read its terms and conditions. He further testified that it was the first time (at trial) that he had seen the service contract that he signed.

{¶8} At some point, Lobdell asked Caudill if different uniform jackets could be ordered. However, before the order was placed, City Laundry became aware of the service contract between Appellant and Appellee, and threated to sue Appellant for contracting with Appellee for uniforms. Thereafter, and shortly after learning that it would be subject to legal action by City Laundry, Appellant advised Appellee that it was terminating the uniform service agreement, because Lobdell lacked the authority to enter into it. Appellee attempted to resolve the conflict, but Appellant refused and unilaterally terminated the agreement.

*Procedural History*

{¶9} This case commenced with Appellee filing a complaint for money damages and complaint for arbitration in the Hancock County Common Pleas Court on January 19, 2016. (Doc. No. 1). Appellee's complaint alleged that Appellant breached its contract with Appellee, requesting $21,394.21 in damages. (*Id.*). Appellee also requested a stay of the proceedings because the contract with Appellant contained a mandatory arbitration provision. (*Id.*).

{¶10} On February 18, 2016, Appellant filed its answer in the trial court denying Appellee's allegations. (Doc. No. 15). The Appellant's answer also contained several affirmative defenses, including the defense that the contract was void because an authorized representative of the Appellant failed to sign the contract. (Doc. No. 15).

{¶11} On April 27, 2016, the trial court scheduled mediation between the parties for July 14, 2016. (Doc. No. 21). At the mediation hearing no business representative appeared for Appellant, just its attorney. (Doc. No. 23). Thereupon, limited discussions occurred and no settlement was reached. (*Id.*).

{¶12} On October 20, 2016, Appellee filed its motion for summary judgment pursuant to Civ.R. 56 in the trial court. (Doc. Nos. 28 & 29). Appellant responded to the motion, arguing that summary judgment was inappropriate because issues of material fact were present, precluding the trial court from entering summary judgment in favor of Appellee. (Doc. Nos. 31 & 32). The trial court denied Appellee's motion for summary judgment on November 21, 2016. (Doc. No. 35).

{¶13} A one-day bench trial occurred in the trial court on February 24, 2017. At the conclusion of the trial the parties were given an opportunity to submit post-trial memorandums on the contested issues. (Doc. No. 37). Each party filed a memorandum. (Doc. Nos. 39-40).

{¶14} On May 16, 2017, the trial court issued its decision awarding judgment to Appellee for $21,394.21 on its breach of contract claim. (Doc. No. 42). Specifically, the trial court found that the testimony and evidence presented at trial did not support Appellant's defense that Lobdell lacked the authority to bind Appellant to the service contract, and damages were awarded based on the liquidated damages clause contained in the contract. (*Id.*). On November 24, 2017,

the trial court filed its final judgment entry, granting Appellee judgment in the amount of $21,394.21, plus costs. (Doc. No. 42). From this final judgment entry Appellant appeals, and presents the following assignments of error for our review:

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT AUBSED [SIC] ITS DISCRETION BY FINDING THAT THERE WAS A VALID CONTRACT AND APPELLANT'S EMPLOYEE, JUSTIN LOBDELL HAD THE APPARENT AUTHORITY TO ENTER INTO THE CONTRACT THAT IS THE SUBJECT OF THIS CASE.**

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT AUBSED [SIC] ITS DISCRETION BY ENFORCING THE LIQUIDATED DAMAGES CLAUSE IN PARAGRAPH 11 OF THE CONTRACT.**

**ASSIGNMENT OF ERROR NO. III**

**THE TRIAL COURT AUBSED [SIC] ITS DISCRETION BY FAILING TO PROPERLY AWARD THE APPROPRIATE DAMAGES AND ALLOWING THE APPELLEE TO COLLECT UNDER THE LIQUIDATED DAMAGES CLAUSE.**

{¶15} On appeal, Appellant challenges the trial court's finding that Lobdell had the apparent authority to enter into a service contract with Appellee. Further, Appellant argues that even if Lobdell did have the apparent authority to enter into the contract with Appellee, the trial court erred by enforcing the liquidated damages clause contained in the contract.

*Appellant's First Assignment of Error*

**{¶16}** In its first assignment of error, Appellant asserts that the trial court abused its discretion by finding that Appellant's employee had the apparent authority to enter into the contract with Appellee. For the reasons that follow, we disagree.

*Standard of Review*

**{¶17}** Appellant argues its first assignment of error under an "abuse of discretion" standard of review. However, we find otherwise. Since the issue before us is whether Lobdell had the apparent authority to enter into a contract with Appellee, we will analyze this assignment of error under the manifest weight of the evidence standard of review.[3] *See generally, Seasons Coal Co. v. City of Cleveland,* 10 Ohio St.3d 77, 79, 461 N.E.2d 1273 (1984). As such, "'[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.'" *Id.* at 80, *quoting C.E. Morris Co. v. Foley Const. Co.,* 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus. In analyzing a trial court's decision, "it is

---

[3] While we could analyze this assignment of error under a sufficiency of the evidence standard of review, pursuant to *Eastley v. Volkman,* we choose to analyze this assignment under a manifest weight of evidence standard of review, because on appeal Appellant is challenging the trial court's interpretation of *the greater amount of credible evidence. See, Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶¶ 10-12.

also important that * * * a court of appeals be guided by a presumption that the findings of the trier-of-fact were indeed correct." *Id.* at 79-80.

*Analysis*

*Existence of a Contract*

{¶18} "'A contract is generally defined as a promise, or a set of promises, actionable upon a breach.'" *Kostelnik v. Helper,* 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16 *quoting Perlmuter Printing Co. v. Strome, Inc.* 436 F.Supp. 409, 414 (N.D.Ohio 1976). "'Essential elements of a contract include an offer, acceptance, contractual capacity, consideration * * *, a manifestation of mutual assent and legality of object and of consideration.'" *Id. quoting Perlmuter, supra.* "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.*

{¶19} To determine whether a valid contract existed, the Court must examine the language contained within the contract. The purpose of contract construction is to realize and give effect to the intent of the parties. *Graham v. Drydock Coal Co.,* 76 Ohio St.3d 311, 313, 1996-Ohio-393, 667 N.E.2d 949. The intent of the parties is presumed to reside in the language they choose to use in their agreement. *Id.* "Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surround the agreement

give the plain language special meaning." *Id.* at 313-14. Lastly, courts are to construe a contract against the party who drafted it. *Id.*

**{¶20}** Appellant claims that the trial court incorrectly found that there was a valid contract between the parties. However, Appellant does not suggest that the contract was invalid because its language was ambiguous or unclear,[4] rather, Appellant asserts that the contract was invalid because Lobdell did not know what he was signing. In support of this assertion, Appellant directs us to Lobdell's testimony on direct examination, wherein he testified that he was not provided with a copy of the contract prior to signing it. (02/24/17 Tr. at 132). Lobdell also testified that he never signed any contracts for Appellant, and his employment duties were limited to signing service and/or delivery slips. (*Id.* at 139). Finally, Lobdell testified that he had no discussion with Cintas regarding the terms of the service contract. (*Id.* at 142).

**{¶21}** However, on cross-examination, Lobdell conceded that he had seen at least the fourth page of the service contract provided by Cintas, as his signature appeared on said page. (*Id.* at 144; *see also,* Appellee Ex. No. 2). Additionally, the contract paragraph immediately above Lobdell's signature contains the following language:

> By signing this agreement, the customer waives his/her signature as a requirement for services rendered. The customer agrees to pay all

---

[4] *See generally, Kelly v. Med. Life Ins. Co.,* 31 Ohio St.3d 130, 132, 509 N.E.2d 411 (1987).

services in full without the signature on their weekly invoice(s). Customers with multiple weekly invoices have the option to waive their signature on all but one invoice or may waive their signature on all invoices. If the customer chooses to retain signature authority, the respective SSR must be able to contact the customer to obtain a delivery signature.

(*Id.*; Appellee Ex. No. 2). Further, the line above Lobdell's signature states: "*I agree that I am authorized to sign on behalf of the Findlay Chrysler Dodge Jeep.*" (Emphasis added). (*Id.*). Moreover, Lobdell testified on cross that he had some discussions with Caudill regarding the service contract, conceding that he agreed to a $200 per week obligation to Cintas for a period of time. (*Id.* at 165).

**{¶22}** Appellee also introduced into evidence a copy of Appellant's City Laundry agreement, which contained Lobdell's signature, revealing that Lobdell was authorized to sign that contract on behalf of Appellant. (*Id.* at 150; *see also* Appellee Ex. No. 8).

**{¶23}** In addition to Lobdell's conflicting testimony (regarding his lack of knowledge of the service contract), Appellee offered the testimony of Caudill in its case in chief. Caudill testified that after he and Lobdell first met to discuss a uniform service agreement, they exchanged e-mails to negotiate the terms of the service contract. (*Id.* at 29). Caudill identified an email of October 7, 2015, between he and Lobdell, verifying their negotiations. (*Id.*; Appellee Ex. 1). Caudill further testified that before Lobdell signed the service contract, he reviewed the terms and

conditions of it with Lobdell, and presented the agreement in electronic form (to Lobdell) for him to read and sign. (*Id.* at 32).

**{¶24}** Appellant's assertion that the service contract was invalid because Lobdell did not read it is inconsistent with the testimony and the evidence produced at trial. Further, even if Lobdell failed to completely read the contract, it is a long-standing contract principle that "parties to contracts are presumed to have read and understood them and that a signatory is bound by a contract that he or she willingly signed." *Preferred Capital, Inc. v. Power Eng. Group, Inc.,* 112 Ohio St.3d 429, 2007-Ohio-257, 860 N.E.2d 741, ¶ 10; *De Camp v. Hamma,* 29 Ohio St. 467, 471-72 (1876). Moreover, since there is competent and credible evidence in the record supporting that Lobdell freely signed the service contract with Cintas, we find no error with the trial court's decision that a valid contract existed between the parties.

*Apparent Authority*

**{¶25}** Next, Appellant argues that even if there was a valid contract, Lobdell did not have the authority to sign it because he was not held out by Appellant as having such (apparent) authority.

**{¶26}** It is well established that "under an apparent-authority analysis, the acts of the principal, rather than the agent, must be examined." *Groob v. KeyBank,* 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 56 *citing Master Consol. Corp. v. BancOhio Natl. Bank,* 61 Ohio St.3d 570, 576-77, 575 N.E.2d 817 (1991).

"For the principle to be liable, the principal's acts must be found to have clothed the agent with apparent authority." *Id.* In Ohio, courts use a two-part test to determine whether apparent authority exists. *Logsdon v. Main-Nottingham Inv. Co.,* 103 Ohio App. 233, 241-42, 141 N.E.2d 216 (2nd Dist.1956). Specifically, a party claiming apparent authority must show:

> (1) [t]hat the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and (2) taht [sic] the person dealing with the agent knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority.

*Id.* Accordingly, we will analyze each factor in turn.

*Principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority*

{¶27} Kable Darrow ("Darrow") is the sole owner of Appellant's dealership. (2/24/2017 Tr. at 168). Darrow testified that it is his company's protocol for him to review contracts if there is a contract to be signed. In support of this contention, Darrow referenced the City Laundry agreement, which Lobdell signed, testifying that Lobdell had a discussion with him prior to Lobdell's signing the addendum to that agreement. (*Id.* at 172; Appellee Ex. No. 8). Darrow also testified that the City Laundry Agreement was signed by his father and general manager, Dan Darrow, with his permission and knowledge. (*Id.* at 170-71).

-13-

{¶28} Moreover, in determining the authority that Darrow held Lobdell to possess to the public, the evidence and testimony supports that Lobdell had authority to enter into contracts. Specifically, Darrow testified that Lobdell was able to sign warranty claims and documents relative to day-to-day operations, such as the purchase of oil, which financially obligated Darrow. (*Id.* at 187). Further, and as previously discussed, Darrow authorized Lobdell to sign the addendum to the City Laundry contract. (*Id.* at 150). Accordingly, despite Darrow's assertion that it was his policy to permit Lobdell and other employees to only sign contracts with his (Darrow's) knowledge and permission, *there was an absence of testimony and evidence* supporting that the public was informed of such policy.

{¶29} As to the contract with Cintas, Darrow testified (that) he was aware (that) Cintas had come to the dealership to discuss uniforms with Lobdell and that Cintas provided his dealership with uniforms after November 4, 2015. (*Id.* at 174; 181). Nevertheless, at no time prior to being threatened with a lawsuit from City Laundry, did Darrow tell Caudill that Lobdell was without authority to sign the service contract on Appellant's behalf.

{¶30} In analyzing the actions of the principal (i.e. Darrow), we find that competent and credible evidence supports the trial court's determination that Darrow "knowingly permitted Lobdell to act as having [the necessary] authority" to sign the Cintas contract, consistent with the apparent authority analysis set forth in

*Master Consolidated Corporation v. BancOhio National Bank.* (Doc. No. 41 at 9); *Master Consol. Corp.,* 61 Ohio St.3d 570, 576-77, 575 N.E.2d 817 (1991). And, because there is competent and credible evidence to support that Darrow clothed Lobdell with the appearance of authority to the public, we cannot say that the trial court's ruling on this prong of analysis was against the manifest weight of the evidence.

*The person dealing with the agent knew of the facts and acting*
*in good faith had reason to believe/did believe that*
*the agent possessed the necessary authority*

{¶31} In our review of the record, we find that competent and credible evidence exists to support Caudill's actions in believing that Lobdell possessed the necessary authority to enter into the Cintas agreement. Specifically, when Caudill first contacted Appellant's dealership, he was directed to Lobdell by the receptionist as the person who handled the dealership's uniforms. (*Id.* at 24). Caudill testified that when meeting with Lobdell, he was informed (by Lobdell) of the existing service contract with City Laundry. (*Id.* at 25). And, after this meeting, Caudill and Lobdell exchanged emails and had discussions at the dealership to negotiate the terms of the service contract. (*Id.* at 29; Appellee's Ex. No. 1). Ultimately, Lobdell signed a contract which specifically provided that "I agree that I am authorized to sign on behalf of the Findlay Chrysler Dodge Jeep." (*Id.* at 33, Appellee's Ex. No. 2). Additionally, and after the service contract was signed, it was Lobdell who

contacted Caudill to change the order because the owner wanted custom shirts. (*Id.* at 35). And finally, Caudill's testimony reveals that after he met with Brunotte, Appellant's Operations Director, no concerns were voiced regarding Cintas providing uniforms or with Lobdell having the authority to enter into a contract. (*Id.* at 27).

**{¶32}** Based upon the actions of Lobdell, Brunotte, and Appellant's various employees, the evidence in the record supports the trial court's finding that Caudill was acting in good faith in believing that Lobdell possessed sufficient authority to enter into a contract on behalf of Appellant. As such, there is competent, credible evidence to support the trial court's determination that the combined conduct of Darrow, Brunotte, and Lobdell was sufficient to establish Caudill's good faith belief that Lobdell had the authority to sign a contract on behalf of Appellant.

*Contract Ratification*

**{¶33}** Even assuming, *arguendo,* that Lobdell lacked apparent authority to enter into the service contract with Cintas, we find that Darrow's behavior ratified the contract that Lobdell entered into. "'Ratification' is a confirmation of a previous, voidable act that operates to give the act the effect it was originally intended to have." *Garrison v. Daytonian Hotel,* 105 Ohio App.3d 322, 326, 663 N.E.2d 1316 (2nd Dist.1995). Furthermore, "it is equivalent to a previous authorization and relates back in time to when the act ratified was done." *Id.* It is

"a well-settled doctrine of the law of agency that a principal may ratify the acts of its agent performed beyond the agent's scope of authority." *Penn Traffic Co. v. AIU Ins. Co.,* 99 Ohio St.3d 227, 2003-Ohio-3373, 790 N.E.2d 119, ¶ 16 *quoting State v. Warner,* 55 Ohio St.3d 31, 65, 564 N.E.2d 18 (1990). Specifically, Darrow testified that he was aware that Cintas had been at the dealership to discuss providing uniform rental services. (2/24/2017 Tr. at 174). Furthermore, Darrow admitted that he was aware that Cintas was providing uniforms for Appellant's dealership and paid Cintas for multiple weeks of service. (*Id.* at 181). Since Darrow was aware of and received the benefit of Cintas' services for several weeks without objection, and complied with the obligations under the contract, we find that that Darrow ratified the service contract between Appellant and Cintas.

**{¶34}** Accordingly, we overrule Appellant's first assignment of error.

*Appellant's Second and Third Assignments of Error*

**{¶35}** In its second and third assignments of error, Appellant argues that the trial court abused its discretion by enforcing the liquidated damages clause in the service contract and by allowing the Appellee to collect such damages. For the reasons that follow, we disagree.

*Standard of Review*

**{¶36}** While Appellant asserts that the trial court abused its discretion under its second and third assignments, this asserted standard of review is misplaced.

Specifically, "the question of whether a stipulation in a contract constitutes liquidated damages, a penalty, or forfeiture is a question of law." *Cintas Corp. v. Joel Lehmkuhl Excavating,* 2nd Dist. Montgomery No. 19613, 2003-Ohio-2958, ¶ 12 *citing Lake Ridge Academy v. Carney,* 66 Ohio St.3d 376, 380, 613 N.E.2d 183 (1993). *See also, Boone Coleman Constr., Inc. v. Piketon,* 145 Ohio St.3d 450, 2016-Ohio-628, 50 N.E.3d 502, ¶ 10. Accordingly, we will review questions of law de novo. *Id.*

*Analysis*

**{¶37}** "Parties are generally free to enter into contracts that include a provision which apportion damages in the event of default." *Id.* However, for public policy purposes, parties may not contract for liquidated damages if they constitute a penalty. *Id.* at ¶ 13 *citing Westbrock v. W. Ohio Health Care Corp.,* 137 Ohio App.3d 304, 322, 738 N.E.2d 799 (2nd Dist.2000).

**{¶38}** In Ohio, courts use a three-part test to determine whether a liquidated damages provision is enforceable:

> Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof.

-18-

*Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St.3d 27, 465 N.E.2d 392 (1984), syllabus *citing Jones v. Stevens,* 112 Ohio St. 43, 146 N.E. 894 (1925), paragraph two of the syllabus.

{¶39} In this case, it is uncontroverted that the contract permitted liquidated damages in the event of cancellation.  Specifically, paragraph 11 of the parties' contract states:

> 11.   Additional customer employees, products and services may be added to this agreement and shall become part of and subject to the terms hereof this agreement, and subject to all of its provisions. *If this agreement is terminated early, the parties agree that the damages sustained by Company will be substantial and difficult to ascertain.* Therefore, if this agreement is terminated by Customer prior to the application expiration date for any reason other than documented quality of service reasons which are not cured as set forth above, or terminated by Company for cause at any time, *Customer will pay to Company, as liquidated damages and not as a penalty, the greater of 50% of the average weekly invoice total multiplied by the number of weeks remaining in the unexpired term, or buy back all garments and other products allocated to Customer at the then current replacement values.* Customer shall also be responsible for any unpaid charges on Customers account prior to termination.

(Emphasis added).  (02/24/2017 Tr. at 31; Appellee Ex. No. 2 at 3).

{¶40} The plain reading of the above language suggests that Cintas explicitly informed Appellant that the liquidated damages provision was not a penalty.  (*Id.*)

Furthermore, we find the terms of this provision to be clear and unambiguous on its face.[5]

{¶41} In our review of the record, we find that Appellee presented evidence to the trial court that the damages would be difficult to prove. Specifically, Christopher Sherman ("Sherman"), Appellee's Market Manager, testified that damages would be uncertain and difficult to prove due to variances in the costs of fuel, delivery, garments, and changes in the customer. (*Id.* at 96). Sherman further testified that Cintas was not able to resell the uniforms because of their customized nature. (*Id.* at 106).

{¶42} We find the evidence supports that the contract in question was not otherwise unreasonable or unconscionable. *See generally, Physicians Anesthesia Serv., Inc. v. Burt,* 1st Dist. Hamilton No. C-060761, 2007-Ohio-6871, ¶ 18. The evidence supports that Caudill advised Lobdell of the terms and conditions of the contract, and that Lobdell had signed other contracts on behalf of Appellant prior to executing the Cintas agreement. (02/24/2017 Tr. at 72). Additionally, Caudill testified that Lobdell reviewed the entire contract, including the terms and conditions prior to signing it. (*Id.* at 76). While Lobdell testified to a different

---

[5] It is of note that the 2nd District Court of Appeals held that a liquidated damages provision involving a contract between Cintas and a third party, containing substantially the same wording as the current contract before the Court, was clear and demonstrated the parties' intent to be bound by such provision. *Cintas Corp.,* 2nd Dist. Montgomery No. 19613, 2003-Ohio-2958, ¶ 21. Additionally, it is also of note that Darrow testified that the City Laundry Agreement he approved contains the same liquidated damages language and calculation formula as the Cintas agreement currently before this Court. (02/2/2015 Tr. at 182; Appellee Ex. No. 8).

version of events surrounding the signing of the contract, a review of his testimony reveals inconsistencies, and in regard to these inconsistencies, we find that the trial court was in the superior position to judge witness credibility as to whether or not Lobdell was indeed credible. *See generally, State v. Bostock,* 4th Dist. Athens No. 11CA23, 2012-Ohio-3324, ¶ 13 (the trial court is in the best position to determine witness credibility). Thus, we find that the contract is consistent with what the parties intended following a breach.

{¶43} While Appellants argue that Appellee should be limited to their actual damages, such argument is contrary to law. "'[I]f a liquidated-damages clause is otherwise valid, the party seeking such damages need not prove that actual damages resulted from a breach.'" *Physicians Anesthesia Serv., Inc.,* 1st Dist. Hamilton No. C-060761, 2007-Ohio-6871, ¶ 20 *quoting Sec. Fence Group, Inc. v. Cincinnati,* 1st Dist. Hamilton No. C-020837, 2003-Ohio-5263, ¶ 8. Appellant attempts to limit the damages to the four-week period in which services were rendered, arguing that the uniforms were returned and therefore reusable by Appellee. However, for the reasons set forth above, this assertion is inconsistent with the testimony produced by Appellee at trial. Because the liquidated damages provision permitted Appellee either recovery of 50% of the average weekly volume multiplied by the number of remaining weeks in the contract, *or* the current replacement value, whichever is greater, the trial court was able to calculate damages consistent with such formula.

(*See generally,* Doc. No. 41 at 12). Therefore, we find no error of law with respect to the trial court's calculation of the liquidated damages per that provision in the contract.

{¶44} Thus, we hold that the liquidated damages clause in the contract was not a penalty, was not ambiguous, and is enforceable as written. Furthermore, we find that the trial court correctly awarded damages based on the plain language provided in the contract. Accordingly, we overrule Appellant's second and third assignments of error.

{¶45} Having found no error prejudicial to the Appellant herein in the particulars assigned and argued, we overrule Appellant's first, second, and third assignments of error and affirm the judgment of the Hancock County Common Pleas Court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and SHAW, J., concur.**

**/jlr**