[Cite as *Eye v. Sal's Heating & Cooling, Inc.*, 2020-Ohio-6737.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

KEVIN EYE,                                   :

     Plaintiff-Appellant,           :

                                   No. 109212

     v.                                   :

SAL'S HEATING & COOLING, INC.,
ET AL.,                                      :

     Defendants-Appellees.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 17, 2020

---

Civil Appeal from the Parma Municipal Court
Small Claims Division
Case No. 18CVI05187

---

### *Appearances:*

J. Brian Kennedy, L.P.A., and J. Brian Kennedy, *for appellant.*

Dan Morell & Associates, L.L.C., Daniel A. Morell, Jr., Rebecca M. Black, and Richard S. Haseltine, III, *for appellee* Sal's Heating & Cooling, Inc.

Baker & Hostetler, L.L.P., and Jeremiah J. Wood, *for appellee* Trane U.S., Inc.

LARRY A. JONES, SR., J.:

**{¶ 1}** Plaintiff-appellant Kevin Eye ("Eye") appeals from the October 16, 2019 judgment of the Parma Municipal Court in favor of defendant-appellee Sal's Heating & Cooling and defendant-appellee Trane, U.S., Inc. ("Trane"). For the reasons that follow, we affirm.

## Procedural and Factual Background

**{¶ 2}** On December 14, 2018, Eye filed this complaint in the Parma Municipal Court, seeking damages based on alleged violations of the Ohio Consumer Sales Practices Act ("OCSPA") and breach of warranty. The case proceeded to a hearing before a magistrate on March 21, 2019. The following facts were adduced at the hearing.

**{¶ 3}** In December 2013, Eye purchased a furnace manufactured by Trane from Sal's Heating & Cooling for his suburban Cleveland home; he received a limited warranty on the furnace from Trane. Sal's Heating & Cooling installed the furnace in May 2014, and Eye registered the limited warranty with Trane in the summer of 2014. From the time the furnace was installed in May 2014, until the time in question, which was March 2018, Eye performed all the maintenance on the furnace himself; he testified that he read the alerts and messages on the unit and changed the filters. Eye admitted that he did not have any background in heating, ventilation, and air conditioning ("HVAC"), and that his furnace was an "incredibly uniquely fancy system."

**{¶ 4}** In early March 2018, the furnace stopped functioning and Eye contacted Sal's Heating & Cooling. By all accounts, at the relevant time, Cleveland was experiencing particularly cold temperatures and there had been storms in the area that resulted in "blackouts" or "brownouts" of power.[1]

**{¶ 5}** On Saturday, March 3, 2018, outside of regular business hours (which the company considered Monday through Friday, 8:00 a.m. through 4:00 p.m.), an HVAC technician from Sal's Heating & Cooling, Zachary Rigney ("Rigney"), went to Eye's home at Eye's request. Rigney examined Eye's thermostat and determined that the "thermostat [was] calling for heat, but it [was] not heating the home." Thus, Rigney obtained Eye's permission to look at the furnace to diagnose the problem. Rigney informed Eye that there would a $99 plus tax service call.[2] Eye agreed; he did not contest that charge at trial, nor does he contest it now. By Eye's own admission, prior to Rigney starting any diagnostic work, he (Eye) signed a service order that contained the following provision:

> IT HAS BEEN EXPLAINED TO ME THAT THE SERVICE CALL RATES WILL APPLY IF THE SERVICE TECHNICIAN DETERMINES THAT REPAIRS MADE TODAY ARE UNRELATED TO WARRANTY AGREEMENT OR REPAIRS ARE MADE UNDER WARRANTY OUTSIDE OF NORMAL BUSINESS HOURS OF 8:00 A.M. TO 4:00 P.M. MONDAY THRU FRIDAY.

(Capitalization sic.)

---

[1]One of the witnesses explained that a blackout is a complete loss of power, while a brownout is intermittent loss of power that results in the "flickering" of electricity.

[2]The testimony revealed that the $99 fee is the standard service charge, regardless of whether the service trip is made during normal business operating hours or after hours.

{¶ 6} Rigney determined that the furnace needed a new circuit board and contacted Sal Sidoti ("Sidoti"), the president and CEO of Sal's Heating & Cooling. Sidoti suggested that Rigney try installing a universal circuit board that they had at the shop; Sidoti suggested this in an attempt to save Eye money and get his furnace functioning quickly.

{¶ 7} Rigney traveled from Eye's home to Sal's Heating & Cooling shop, both of which are located in North Royalton, Ohio. He retrieved a universal circuit board and returned to Eye's home. Eye contends that Rigney brought back the "wrong part." Rigney testified, however, that he got the universal circuit board Sidoti suggested but, unfortunately, the circuit board was not compatible with Eye's furnace. Rigney testified that he spent two hours at Eye's house and Eye was not charged for the trip to the shop for the circuit board and back to Eye's house that Saturday. Eye was charged a one-time flat fee of $99 for the service call and diagnosis.

{¶ 8} Rigney testified that after the universal circuit board did not work, he and Eye talked about Rigney obtaining the compatible circuit board the next day, Sunday, from Wolff Brothers Supply. Rigney testified that he told Eye that Wolff Brothers Supply was not open on Sundays, so the business would have to open its shop for Rigney to get the part and that would cost Eye an additional $300.

{¶ 9} Rigney testified that he went over the pricing, and the fact that, because it was a weekend, the repairs would be out of warranty "multiple times"

with Eye. He testified that "everything I had to do that night was a headache," but Eye wanted his heat restored over the weekend rather than wait until Monday and he worked as hard as he could to make that happen. Rigney was adamant that he explained all the charges to Eye, testifying that he told Eye,

> so if you want to proceed with opening up the wholesale house which is $300.00 and you want to proceed in getting a circuit board then I have to make sure that you're okay with that before I run and go — I'm not going to just walk out the house blind and say hey maybe this guy is going to pay $1,100.00.

{¶ 10} According to Rigney, Eye agreed to the charges.

{¶ 11} Thus, the following day, Sunday, March 4, 2018, Rigney traveled from Sal's Heating & Cooling in North Royalton to Wolff Brothers Supply in Bedford Heights to obtain the proper circuit board. Rigney then went to Eye's home that Sunday to install the circuit board. Prior to the installation, Rigney presented Eye with another service order detailing the fixed-rate cost of $810 for the circuit board and the $300 warehouse opening charge. Eye signed the service order, which contained the same previously mentioned language that service rates applied to repairs made outside of the warranty or repairs made under warranty but outside of normal business hours. Rigney also testified that Eye did not ask him to leave the old circuit board, so he took it with him and threw it away, as he customarily would do.

{¶ 12} According to Eye's testimony, he did not contest the charges at the time the service was being rendered. He also did not inquire as to whether the parts or service would be covered by the warranty at the time the service was being

rendered. Eye testified that he asked Rigney "how much this was going to cost and he said $810.00." Eye admitted that Rigney presented him with a service order that listed the $810 circuit board charge and $300 warehouse opening fee, but according to Eye, Rigney told him that he "got lucky" and the warehouse was open so he would not have to pay the $300 opening fee. Rigney denied that claim, however.[3]

{¶ 13} After the repair had been completed, Eye wondered why the charges were so high, and called Trane the following Monday and "verified that [his] unit was under warranty." Eye then called Sal's Heating & Cooling to ask why his bill was so high when his furnace was still under warranty. Eye testified that he asked for an itemized bill and what the company's after hours and weekend charges were; Eye said that the company refused to provide him with either.

{¶ 14} According to the trial testimony, power flickering would likely cause a furnace circuit board to malfunction. Ronald Doolittle ("Doolittle") of Wolff Brothers Supply, who spoke with Eye, testified that Eye told him that prior to the furnace malfunctioning he had experienced power flickering. Witnesses for the appellees also testified that proper maintenance on the furnace under the warranty at issue here (as well as under similar warranties) would require professional servicing on at least an annual basis, even in the first year of use. For example, Doolittle testified that "[t]here's a lot more to [proper maintenance] than just

---

[3]Eye testified that when Rigney originally told him that the warehouse had to be opened and there would be a $300 charge to do so, he (Eye) "told him that was fine."

changing filters." He elaborated that proper maintenance would include looking "over the system, you got to check electrical, you got to check gas pressure, you have to look at the unit inside and out * * * check duct work, look at the venting intake and exhaust, it could still be working but not to the proper functions." According to the appellees' witnesses, Eye's failure to have the furnace professionally maintained fell below the standard for proper maintenance.

{¶ 15} Sidoti testified that, as a courtesy to Eye, his company checked the warranty he had on the furnace and determined that the circuit board was not covered. Specifically, the warranty excluded "Failures, defects, or damage * * * caused by * * * (3) improper * * * maintenance, or * * * (6) any acts of God including, but not limited to * * * storms [or] lightning * * *." The company maintained that it believed that the power flickering due to the weather conditions constituted an act of God that excluded the repair from the warranty. Further, Sal's Heating & Cooling maintained that Eye's failure to properly maintain the furnace voided the warranty. Moreover, the warranty excluded "Labor costs, including, but not limited to, costs for diagnostic calls or the removal and reinstallation of Products and/or Product parts" and "shipping and freight expenses required to ship Product replacement parts." Sal's Heating & Cooling maintained that the $300 charge for the Sunday opening of Wolff Brothers Supply was excluded under the warranty as a shipping and freight cost.

{¶ 16} Sidoti also testified that Eye was a "good customer," he wanted to "help him out" because he likes "to take care of [his] customers but at the same

time [he has] to carry the cost of doing business." As Rigney explained, the company does not "do warranty work on the weekend [because] that's when you make all your bread and butter."

{¶ 17} The testimony as to Trane was that Sal's Heating & Cooling was authorized to perform service on Trane furnaces and that Sal's signed up for Trane's "Dealer Care Program." There was no testimony about what the Dealer Care Program entailed, however, or what authority Trane supposedly granted Sal's Heating & Cooling. Eye submitted into evidence a printout from Sal's Heating & Cooling's website stating that the company was an authorized Trane dealer.

### Magistrate's Decision and Trial Court's Judgment

{¶ 18} On July 10, 2019, the magistrate issued a decision. The magistrate found that Eye failed to present sufficient evidence to establish that Trane held Sal's Heating & Cooling out as its agent. The magistrate further found that Eye did not assert that he "took any action or even had any belief that Sal's was acting as Trane's agent" in the transaction. The magistrate also found that Sal's Heating & Cooling did not violate the OCSPA, but nonetheless awarded Eye $810 for the circuit board.

{¶ 19} Eye filed objections to the magistrate's decision. Eye filed his objections without the benefit of a transcript because it had not yet been transcribed, and noted what he "anticipated the transcript would demonstrate." Trane filed a response to Eye's objections, noting that Eye was relying on "non-existent testimony from a missing transcript." Sal's Heating & Cooling filed

objections to the magistrate's decision, challenging the magistrate's decision to award Eye $810.

{¶ 20} On October 16, 2019, the trial court issued its decision. Relative to Sal's Heating & Cooling, the court found that the "warranty was void and/or did not apply, and the company did not violate the OCSPA; thus, Eye was not entitled to $810." Relative to Trane, the court overruled Eye's objections, finding that Eye failed to present evidence establishing any agency theory between Trane and Sal's Heating & Cooling.

{¶ 21} On November 6, 2019, Eye filed a motion for a new trial. The motion did not attack the substance of the trial court's October 16 judgment. Rather, Eye contended that the trial court did not review the trial transcript and sought a "new trial" so the court could review the transcript. The trial court denied Eye's motion the following day, stating that it "reviewed a complete copy of all transcripts and filings when considering Plaintiff's objections to the Magistrate's report and recommendations." Eye now appeals, raising the following three assignments of error for our review:

I. The lower court erred in finding there was no agency relationship between Appellee Trane and Appellee Sal's.

II. The lower court erred by ruling that Sal's act of disclaiming responsibility under the warranty, charging a fix[ed] fee for warranted repairs, and concealing the costs of the component part for the repair, constituted neither a CSPA violation nor a breach of warranty.

III. The lower court erred in ruling that the recovery under the warranty was precluded by exclusions.

## Law and Analysis

{¶ 22} The standard of review for proceedings in small claims court is abuse of discretion. *Video Discovery, Inc. v. Passov*, 8th Dist. Cuyahoga No. 86445, 2006-Ohio-1070, ¶ 7; *Feinstein v. Habitat Wallpaper & Blinds*, 8th Dist. Cuyahoga No. 67419, 1994 Ohio App. LEXIS 5771 (Dec. 22, 1994). In reviewing the trial court's ruling on objections to a magistrate's decision in small claims court, we must determine whether the trial court abused its discretion in reaching its decision. *Tennant v. Gallick*, 9th Dist. Summit No. 26827, 2014-Ohio-477, ¶ 35. An abuse-of-discretion standard "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

## Agency Relationship between Sal's Heating & Cooling and Trane

{¶ 23} In his first assignment of error, Eye contends that he "presented a litany of evidence that Sal's was Trane's authorized representative for the purpose of conducting warranty repairs." On this issue, the trial court ruled as follows:

> The Magistrate correctly decided that Plaintiff failed to establish that Defendant Sal's Heating & Cooling was Trane's agent. Whether Plaintiff argued express authority, implied authority or authority by estoppel, Plaintiff presented no evidence at trial to satisfy his burden of proof.
>
> Plaintiff, in his objections to the Magistrate's Decision, attempted to fix his failure by pointing to non-existent testimony from a missing transcript of some express agreement between Sal's and Trane creating an agency relationship. There was no such testimony. Plaintiff also abandoned his apparent authority argument but then

asserted that he had established the requisite agency relationship through "agency by estoppel." Again, Plaintiff presented no evidence to support this theory.

{¶ 24} Eye contends that testimony of an agency relationship was established by Sal's Heating & Cooling's two witnesses, Sidoti and Rigney, who testified that Sal's Heating & Cooling was authorized by Trane to perform warranty repairs. Eye also cites to the printout from Sal's Heating & Cooling's website stating that it was an authorized Trane dealer. Eye did not allege any specific wrongdoing against Trane; rather, he contended that Trane was liable to him for the alleged wrongful acts of Sal's Heating & Cooling under an agency theory.

{¶ 25} The creation of an agency relationship may be express or implied. "The relationship of principal and agent, and the resultant liability of the principal for the acts of the agent, may be created by the express grant of authority by the principal. Absent express agency, the relation may be one of implied or apparent agency." *Master Consol. Corp. v. BancOhio Natl. Bank*, 61 Ohio St.3d 570, 574, 575 N.E.2d 817 (1991).

{¶ 26} Regarding express authority, Eye contends that all he needed to prove was that Sal's Heating & Cooling was an authorized dealer for Trane. We are not persuaded by his contention, and find *Tsirikos-Karapanos v. Ford Motor Co.*, 2017-Ohio-8487, 99 N.E.3d 1203 (8th Dist.), cited by Trane, on point. In *Tsirikos-Karapanos*, the plaintiff sought to hold Ford Motor Co. liable for repairs done at one of Ford's authorized dealerships; the repairs were completed under warranty. This court found that an agency relationship was not created based

solely on the fact that the dealership was an authorized dealership. The plaintiff relied solely on the dealership being an authorized warranty repair facility to fulfill his burden of proof. This court found that insufficient. In other words, the plaintiff needed to present more evidence to sustain his burden of proof, which he failed to do. Likewise, here Eye has not presented evidence other than Sal's Heating & Cooling "authorized dealer" status as proof as an agency relationship.

{¶ 27} Eye attempts to rely on *Curl v. Volkswagen of Am., Inc.*, 114 Ohio St.3d 266, 2007-Ohio-3609,871 N.E.2d 1141, in support of his position, claiming that *Curl* stands for the proposition that "a third party that is authorized to perform warranty repairs is an agent for that purpose." We disagree.

{¶ 28} In *Curl*, a Volkswagen dealership purchased a Volkswagen car from Volkswagen of America and put the car in its rental fleet. Several months after being in the rental fleet, a recall was issued for certain Volkswagen cars, including the one at issue. The dealership never performed the recall repairs on the vehicle, however.

{¶ 29} Approximately three months after the recall notice had been issued, the dealership sold the car to the plaintiff, who, about two months later began experiencing problems with the car. The plaintiff had the car towed to the dealer. The dealer discovered that the problem with the car was related to the subject of Volkswagen's recall; the dealer repaired the car, which took 84 days to complete. The plaintiff sued Volkswagen of America, for among other claims, breach of written and implied warranties, based, in part, on an agency theory.

{¶ 30} The plaintiff contended that his relationship with the dealer and the dealer's relationship with Volkswagen established privity under the principles of agency law. The Ohio Supreme Court disagreed, citing the following from Restatement of the Law 2d, Agency (1958), Section 14J:

> [o]ne who receives goods from another for resale to a third person is not thereby the other's agent in the transaction:  whether he is an agent for this purpose or is himself a buyer depends upon whether the parties agree that his duty is to act primarily for the benefit of the one delivering the goods to him or is to act primarily for his own benefit.

*Curl* at ¶ 33, quoting Restatement of the Law 2d, Agency, Section 14J (1958).

{¶ 31} The court noted that although the dealer was an authorized dealership of Volkswagen for warranty repairs, and although the purchase agreement between the dealer and the plaintiff contained a Volkswagen emblem, the dealer purchased the subject car primarily for its own benefit as a rental car without any intent to benefit Volkswagen through its actions.  Only after it used the car as a rental vehicle did the dealer sell the car to the plaintiff.  Thus, the court held that, under the fact of the case, principles of agency did not create the requisite privity to hold Volkswagen accountable.

{¶ 32} The facts presented in *Curl* are not on all same fours as the facts here.  That is, *Curl* is distinguishable from this case in that the dealer first used the product (i.e., the car) for its own benefit before selling it to the plaintiff.  But according to Eye, "the Supreme Court did not hold that dealerships who are authorized to do warranty repairs were not agents for the purposes of doing warranty repairs.  It held just the opposite."  Based on our review of *Curl*, as stated

above, the court did not hold that dealerships authorized to perform warranty repairs were per se agents of a manufacturer under an express authority theory.

{¶ 33} Eye cites to Rigney's (the technician from Sal's Heating & Cooling who did the repair work) testimony in an attempt to establish express authority. Rigney admitted that Sal's Heating & Cooling was authorized to do repairs for Trane, that the business was a Trane dealer, and that that information was contained on Sal's Heating & Cooling website. But Rigney did not testify about any express agreement, or the specific terms of any agreement, between Trane's and Sal's Heating & Cooling. His testimony was insufficient to establish an agency relationship between Trane and Sal's Heating & Cooling.

{¶ 34} We also do not find Eye's citation to Sidoti's testimony helpful to his agency claim; Sidoti also did not establish any agreement between Trane and Sal's Heating & Cooling. Rather, Sidoti merely established that Sal's Heating & Cooling was authorized to perform service on Trane furnaces and that Sal's signed up for Trane's "Dealer Care Program." But as mentioned, there was no testimony about the details of the Dealer Care Program or what authority Trane allegedly granted Sal's Heating & Cooling. On this record, Eye failed to demonstrate that an express agency relationship between Trane and Sal's Heating & Cooling existed.

{¶ 35} Eye also contends that an implied or agency by estoppel relationship was created. An agency by estoppel is created where a principal holds an agent out as possessing authority to act on the principal's behalf, or the principal knowingly permits the agent to act as though the agent had such authority. *McSweeney v.*

*Jackson*, 117 Ohio App.3d 623, 630, 691 N.E.2d 303 (4th Dist.1996). For a principal to be bound by an agent's acts, the evidence must show that: (1) the defendant made representations leading the plaintiff to reasonably believe that the wrongdoer was operating as an agent under the defendant's authority; and (2) the plaintiff was thereby induced to rely upon the ostensible agency relationship to his or her detriment. *Shaffer v. Maier*, 68 Ohio St.3d 416, 418, 627 N.E.2d 986 (1994).

{¶ 36} Again, Eye failed to present evidence to show that Trane made representations leading Eye to reasonably believe that Sal's Heating & Cooling was operating as an agent under Trane's authority. Eye has also failed to demonstrate that he was induced to rely on the purported agency relationship to his detriment. The evidence Eye submitted in support of his agency by estoppel claim — a printout from a website — was insufficient to establish the two elements for an agency by estoppel claim. Eye did not testify that he ever visited the website prior to the repairs being done and that the website caused him to believe that Trane was holding out Sal's Heating & Cooling as its agent. Moreover, Eye did not testify that he decided to purchase his furnace from Sal's Heating & Cooling because of any representation made by Trane. Similarly, he did not testify that he decided to have Sal's Heating & Cooling repair the furnace based on any representation made by Trane.

{¶ 37} On this record, we find that the trial court did not abuse its discretion by ruling in favor of Trane and against Eye on Eye's express agency and agency by estoppel claims. The first assignment of error is therefore overruled.

## Sal's Heating & Cooling Liability

{¶ 38} In his second assignment of error, Eye contends that Sal's Heating & Cooling's actions in this case constituted a violation of the OSCPA and a breach of warranty, and the trial court abused its discretion in finding otherwise. According to Eye, Sal's Heating and Cooling committed violations of the OSCPA and breach of warranty by (1) disclaiming responsibility under the warranty, (2) charging a fixed fee for warranted repairs, and (3) concealing the costs of the component part for the repair.

{¶ 39} As mentioned, Eye signed a service order containing the following language:

> IT HAS BEEN EXPLAINED TO ME THAT THE SERVICE CALL RATES WILL APPLY IF THE SERVICE TECHNICIAN DETERMINES THAT REPAIRS MADE TODAY ARE UNRELATED TO WARRANTY AGREEMENT OR REPAIRS ARE MADE UNDER WARRANTY OUTSIDE OF NORMAL BUSINESS HOURS OF 8:00 A.M. TO 4:00 P.M. MONDAY THRU FRIDAY.

(Capitalization sic.)

{¶ 40} Eye contends that the provision violated Ohio Adm.Code 109:4-3-05(D)(1) and R.C. 1345.02(B)(10). Ohio Adm.Code 109:4-3-05(D)(1) provides as follows:

> (D) In any consumer transaction involving the performance of any repair or service it shall be a deceptive act or practice for a supplier to:

(1) Make the performance of any repair contingent upon a consumer's waiver of any rights provided for in this rule;

\* \* \*

(12) Fail to provide the consumer with a written itemized list of repairs performed or services rendered, including a list of parts or materials and a statement of whether they are used, remanufactured, or rebuilt, if not new, and the cost thereof to the consumer, the amount charged for labor, and the identity of the individual performing the repair or service.

{¶ 41} R.C. 1345.02(B)(10) deems it an unfair or deceptive practice for a supplier to represent that a consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false. We find no abuse of discretion in the trial court's assessment that Sal's Heating & Cooling did not violate either Ohio Adm.Code 109:4-3-05(D)(1) or R.C. 1345.02(B)(10).

{¶ 42} Eye agreed to have the work completed on the weekend, instead of waiting until a weekday; he signed the service order, under which he agreed that any repairs, even those "made under warranty [but] outside of normal business hours" would be subject to the service call rates. The order stated that normal business hours were 8:00 a.m. to 4:00 p.m., Monday through Friday.

{¶ 43} Eye cites *Fletcher v. Don Floss of Cleveland, Inc.*, 90 Ohio App.3d 82, 628 N.E.2d 60 (8th Dist.1993), where this court upheld the plaintiffs' contention that the business engaged in an unfair or deceptive act by disclaiming a warranty obligation or confusing what was covered under the warranty. In *Fletcher*, the plaintiffs purchased a vehicle from the defendant dealer. The

plaintiffs signed the following documents: (1) "Used Car Order," (2) "Buyers Guide," and (3) "All Sales Final." *Id.* at 84. One of the documents had the following inscription: "AS IS — NO WARRANTY." *Id.* In addition to the "No Warranty" statement in the agreement, the plaintiffs were presented with a "Limited Warranty Certificate" providing 50/50 coverage with the dealer assuming 50 percent cost of all repairs relative to transmission rear end and universal-joint problems. *Id.* The agreement also contained the following language: "you (meaning the purchaser) will pay all costs for repairs." *Id.*

{¶ 44} Within minutes after the plaintiff purchased the vehicle, the vehicle malfunctioned; the dealer made the repairs. The vehicle malfunctioned a second time, a little over a month later, but the dealer refused to perform the repairs, claiming that it was outside of the 30-day warranty window.

{¶ 45} We do not find that the circumstances of this case are akin to those in *Fletcher*. Where the defendant dealership created confusion in *Fletcher*, Sal's Heating & Cooling made it clear up front that the repairs would not be covered under the warranty, because even if they had been covered, the weekend repair took them out of the realm of the warranty. Eye signed the service order that stated that. As such, we find *Fletcher* distinguishable from this case, and we find no merit to Eye's contention that Sal's Heating & Cooling disclaimed responsibility under the warranty or charged a fixed fee for warranted repairs.

{¶ 46} We also find no merit to Eye's claim that Sal's Heating & Cooling concealed the price of the replacement part. As stated, Sal's Heating & Cooling

initially attempted to install a universal circuit board that it had in its store — it did not bring the wrong part, as Eye contends; rather, the company attempted to restore heat to Eye's home as soon as possible by using a circuit board it already had in stock. Further, prior to obtaining the circuit board that was installed, Eye signed a service order that detailed the fixed-rate cost of $810 for the replacement circuit board. Eye also authorized the $300 fee that he was charged for Wolff Brothers Supply to open its warehouse.

{¶ 47} In light of the above, the trial court did not abuse its discretion in finding that Sal's Heating & Cooling neither violated the OCSPA nor breached its warranty. The second assignment of error is therefore overruled.

{¶ 48} In his final assignment of error, Eye contends that the trial court abused its discretion by finding that the exclusions under the warranty applied.

{¶ 49} The evidence presented at trial demonstrated that Eye had not had his furnace professionally serviced in the four years since he purchased it. The appellees' witnesses testified that the furnace needed to be maintained by a certified technician and it was their professional belief that the lack of professional service on the furnace fell below the standard for maintenance of the furnace. Further, storms in the area leading up to the furnace malfunctioning caused the power to "flicker" at Eye's home, which, under the warranty, would constitute an "act of God" exclusion under the warranty.

{¶ 50} Eye also contends that he was hampered in his ability to present a case about the exclusions not applying because Rigney threw the old circuit board

away. According to Eye, that action created a spoliation of evidence situation. The Ohio Supreme Court has recognized the elements for a spoliation claim as follows: (1) pending or probable litigation involving the claimant; (2) the respondent's knowledge that litigation exists or is probable; (3) willful destruction of evidence by respondent designed to disrupt claimant's case; (4) actual disruption of claimant's case; and (5) damages resulting therefrom. *Smith v. Howard Johnson*, 67 Ohio St.3d 28, 29, 615 N.E.2d 1037 (1993).

{¶ 51} There simply is no evidence of a spoliation claim here. The record reflects that Rigney — and Eye — were focused on restoring heat to Eye's home; the record is devoid of any evidence that this situation would probably end up in litigation and, knowing that, Rigney intentionally destroyed the evidence. Eye did not ask for the old circuit board, and as was his custom, Rigney threw it away.

{¶ 52} In light of the above, the third assignment of error is without merit.

{¶ 53} Judgment affirmed.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LARRY A. JONES, SR., JUDGE

PATRICIA ANN BLACKMON, P.J., and
MARY EILEEN KILBANE, J., CONCUR